[Civ. No. 6671.   Third Dist.   Apr. 15, 1942.]

KATHERINE RUEB METZ, as Administratrix, etc., Respondent, v. SOUTHERN PACIFIC COMPANY (a Corporation), Appellant.

George R. Freeman, Elmer Laine and Tebbe & Correia for Appellant.

Hildebrand & Bills, Hildebrand, Bills, Myers & McLeod, J. Everett Barr and Goodman & Brownstone for Respondent.

THOMPSON, Acting P. J.—The defendant has appealed from a judgment which was rendered against it, pursuant to the verdict of a jury, in a suit for damages for the death of plaintiff's husband, Emil George Metz, which occurred in the course of his employment with the railroad company as a sign painter, as the result of the derailing of an alleged defective motor car which he was operating along the track in the vicinity of Tulelake. The suit was brought under the Federal Employers' Liability Act. (45 U. S. C. A., sec. 51.)

To establish her cause of action the respondent relied chiefly on the doctrine of *res ipsa loquitur*. The appellant contends that the judgment is not supported by the evidence; that the principle of *res ipsa loquitur* has no application to the facts of this case, since the deceased person was in actual control and operation of the motor car at the time of the accident, and that the court erred in giving to the jury certain instructions.

The Southern Pacific Company is engaged in interstate commerce. It maintains a branch track from Klamath Falls, Oregon, in a southeasterly direction through the northeastern corner of California, to Sparks, Nevada. The accident occurred at a point between the stations of Tulelake and Alturas, in Modoc County, California, where the track is comparatively level. Mr. Metz was an able-bodied man forty-six years of age. He left surviving him the plaintiff, his widow, and a nineteen-year-old son who is enlisted in the United States Army at Honolulu. Mr. Metz had been employed by the railroad company, as a painter, for seventeen years. It was his duty to travel along the track within a designated district and to keep the railroad signs, adjacent to the track, freshly painted. For that purpose he was supplied by the company with a light motor car which he personally operated, and upon which he carried his equipment and materials. His motor car required

replacement. June 1, 1939, two weeks before the accident occurred, the company supplied him with a used Adams Motor Car, No. 2-A, which had been formerly operated by another employee in the vicinity of Black Butte. It was a gas-engine car weighing 385 pounds. It was of a type different from the one he was accustomed to use. There is no evidence the deceased was familiar with that model of machine. Before delivering this car to Mr. Metz, it was overhauled and repaired under the direction of Ernest W. Carlton, the company's motor car mechanic. There is some evidence this particular car was defectively constructed or adjusted and dangerous to operate. Although Mr. Carlton denied the statements, Mr. Sam Aldrich, a retired section foreman, who had formerly been employed with the company for forty-two years, testified that he had a conversation with Carlton at Dunsmuir on June 21, 1939, a few days after the accident occurred, in which he said the motor car which was used by Mr. Metz at the time of his accident "should have been put out of service because of its dangerous and defective condition." He further said that the car on that occasion had caused a lot of trouble and was not a safe car to operate. There is no evidence the deceased had any knowledge of that fact.

The evidence which was adduced at the trial very satisfactorily shows that the motor car which was involved in this accident was so adjusted as to render it dangerous to operate the machine backward. While it could be slowly run in reverse at a rate of three or four miles an hour, evidently the car was designed to be propelled forward only, at a rate of speed not to exceed fifteen or twenty miles per hour. The machine is constructed to carry the main portion of the load over the heavier right-hand wheels which are seventeen inches in diameter. The left-hand wheels are only fourteen inches in diameter and serve to guide the machine and keep it running on the track with the flanges of the right-hand wheels close to the adjacent rail. The left-hand guide-wheels are adjusted by means of bolts and nuts, at a slight angle from the line of the rail. On that account, the operation of the car in the reverse direction tends to cause the small guide-wheels to jump the rail along which they travel, especially when the car is run at a normal rate of speed. Mr. Carlton testified in that regard:

"In running this motor car forward, the weight is dis-

tributed so that if you keep the front main wheel running against the rail it will run steady and it will stay there and the car will run constantly ahead and it won't run backwards at all. They found that out very soon after we got these cars, some of them tried it, and found out it didn't work. If anybody would run that car backwards the Lord would have to have his arms around them, but they wouldn't get far. . . . The wheels were just aligned for the car to go in one direction, and that was forward.''

Mr. Carlton claimed that he cautioned Mr. Metz against running the machine backward. He said:

''I also cautioned him about running the car backwards, because the wheels were just aligned for the car to go in one direction, and that was forward.''

Mr. Harry C. Crawford, an assistant railroad inspector, testified in behalf of the defendant that he told Mr. Metz about June 1st, just before the accident occurred, that the company ''was going to send up a side-load motor car and to be careful when he operated it and not to operate it backwards. . . . They will leave the track if you run them backwards very fast.'' However, Mr. Francis M. Hrubanik, an investigator belonging to the Brotherhood of Railway Trainmen, testified that he had a conversation with Mr. Crawford at his home in Dunsmuir sometime after the accident occurred, in which Crawford told him that he never instructed Mr. Metz or any other person with regard to the manner of operating the motor car, and that the first time any orders were ever issued to anyone regarding the manner of operating motor cars was on June 26, 1939, after the accident occurred.

The motor which furnishes the power with which to operate the car in question is attached to the axle which connects with the rear right-hand drive-wheel. Extending along the entire right-hand side of the machine there is a frame which is built to about sixteen inches in height above the level of the floor, enclosing the right-hand wheels. This frame is covered with boards to serve as a seat. The rear end of the bench is supplied with a cushion where the operator of the machine sits directly over the drive-wheel. Beneath this seat there is a box in which the battery is installed. The motor and crankcase are at the driver's feet, inside the rear drive-wheel. The motor is controlled by means of a lever and an electric-contact device accessible from the rear seat. When the contact is tightly grasped by the operator it develops sparks causing

combustion from which the power is derived. When the grasp on this device is released the power is automatically disconnected. At this rear seat there is also a lever which controls the brake. It should be recalled this driver's seat is stationary at the rear right-hand side of the car over the drive-wheel. Resting on the frame of the machine there is a tool-tray fourteen inches in width and fifty-seven inches in length extending from front to rear. In this box the paint cans, materials and equipment of Mr. Metz were carried.

In the vicinity of the place where the accident occurred, on the southerly side of and adjacent to the railroad track, between Tulelake and Alturas, there is a stock corral and cattle chute. About two hundred feet northwesterly from that chute, Mr. and Mrs. Charles H. Reynolds and their two children lived in a small house situated on the same side of the track. Mr. and Mrs. Kenneth E. Thomas and their two children lived in another house near by. It was also situated on the same side of the track. These two families were engaged in raising potatoes in that locality.

About ten o'clock on the morning of June 14, 1939, Mrs. Reynolds, who was then standing in the front doorway of her home, saw Emil Metz sitting alone on the seat at the rear right-hand side of the motor car as he drove it southerly along the track in the direction of Alturas. After he passed from sight and had been gone about twenty minutes, she again stepped to the door and saw him returning. She said "He was on the *left front* going towards Tulelake." This clearly indicates that he had not turned the machine around, but was driving it backward toward Tulelake. The machine was moving slowly. She said "I wouldn't say he was going fast."

It appears that during the twenty minutes which elapsed after Mr. Metz passed the Reynolds' house driving southeasterly toward Alturas, he painted one railroad crossing sign and a whistling sign, both of which were within a distance of about 600 feet from her house. After Mrs. Reynolds observed Mr. Metz pass her home upon his return toward Tulelake, she turned away from the door. Almost instantly she heard the children scream. They were then playing in front of the house, near the track. She also heard an unusual commotion and realized that the chug of his motor had ceased. She rushed back to the door and saw that the motor car had jumped the track on the northerly side and stood close to

and at an acute angle from the northern rail. The body of Mr. Metz lay upon the embankment close to his machine. He was badly injured, helpless and suffering great pain. Mrs. Reynolds ran to the home of her neighbor, Mrs. Thomas, for assistance. Both women immediately went to the scene of the accident. Within a few moments Mr. Reynolds arrived. He said that he found Mr. Metz lying in a semi-conscious condition "between the track"; that the motor car stood on the northerly side of the rails "with the wheels flush against the track parallel so that one end of his speeder would be facing directly north." Mr. Reynolds proceeded to roll the motor car onward five or six feet farther away from the rail. The car remained in that position for several days. Mr. Reynolds assisted in conveying Mr. Metz to the motor car upon which he was placed, and then drove down the road a short distance where he had seen a section crew at work. He found Carl Tonole, a section track foreman, and notified him of the accident. Tonole soon arrived at the scene of the accident and made a careful inspection of the track and car to try to ascertain the cause of the accident. Mr. Metz was unable to talk. He never recovered his speech so as to tell anyone how the accident happened. He was soon removed to a hospital, and died the following day from the effect of his injuries.

There is no dispute over the fact that the flanges of the heavy wheels of the motor car left a distinct crease across the surface of each wooden tie in a curved line from the point where the car evidently left the rail, a distance of about twenty-four feet, directly to the place where the car jumped the northern rail and came to a stop. All witnesses agree to that fact. Since the car was found directly at the end of that mark with the front wheels nearest the track, we are convinced it must have been traveling backward when it was derailed. This conclusion is corroborated by the fact that the small guide-wheels were adjusted at an angle to crowd the flanges of the heavy wheels against the rail on the opposite side of the track, when the machine was running forward. It seems reasonable to assume that, on the same principle, when the machine was running in the opposite direction, the slant of the guide-wheels would tend to make them jump the rail upon which they rolled just as it did on this occasion. We have no doubt that is exactly what occurred.

However, that does not necessarily mean this judgment

should be reversed. Notwithstanding the fact that the respondent strongly urges in her briefs that there are circumstances and inferences in the record from which the jury was warranted in concluding the deceased was running his motor car in a forward direction when the accident occurred, we assume that if the evidence supports a finding that the defendant was guilty of negligence in furnishing their employee with a defective and dangerous motor car, without informing him of that fact, and that he was not charged with knowledge of his danger and did not assume the risk of those defects under the circumstances of this case, then the judgment should be affirmed.

The plaintiff relied on the doctrine of *res ipsa loquitur* for her cause of action. In effect, she asserted she did not know how the accident occurred. On appeal, a reviewing court is not bound by the respondent's theory of the cause of accident as disclosed in the briefs, when he relies on the doctrine of *res ipsa loquitur,* provided the record adequately supports the judgment on another theory which is contained within the issues of the pleadings. The very theory upon which *res ipsa loquitur* is founded is that the plaintiff does not know what caused the accident.

We are of the opinion the record does not contain substantial evidence that Emil Metz was engaged in running his motor car in a forward direction at the time of the accident. On the contrary, we are satisfied he was then propelling it backward. There is, however, ample evidence from which the jury was warranted in determining that the car was dangerous and defective when it was propelled backward at a normal rate of speed; that the defendant and its agents knew that fact, and failed to warn the deceased against such defect and danger; that the deceased was not acquainted with that particular type of car, and that there is no evidence Mr. Metz knew of the defect of the motor car or of the danger of propelling it backward. It is true that both Mr. Crawford and Mr. Carlton testified they warned the deceased against driving the machine backward, but evidence in rebuttal was adduced by the plaintiff tending to impeach those witnesses and the jury was therefore warranted in disbelieving them in that regard. The weight of their evidence, in that respect, and the credibility of these witnesses were matters for the determina-

tion of the jurors. We may not interfere with their exclusive province in that regard.

The California cases, and the weight of authorities in most jurisdictions, hold that the doctrine of *res ipsa loquitur* applies, under proper circumstances, to actions by employees against their employers. (*Nolen* v. *F. O. Engstrum Co.*, 175 Cal. 464 [166 Pac. 346]; *O'Connor* v. *Mennie*, 169 Cal. 217 [146 Pac. 674]; *Ronconi* v. *Northwestern Pac. R. R. Co.*, 35 Cal. App. 560 [170 Pac. 635]; *Lippert* v. *Pacific Sugar Corp.*, 33 Cal. App. 198 [164 Pac. 810]; 6 Thompson's Comm. on Negligence, 632, secs. 7649, 7650.) It is true the mere fact that one is injured from an unknown cause does not raise the presumption of negligence on the part of the owner of the instrumentality which is used at the time of the accident. (38 Am. Jur. 989, sec. 295.) Further facts are required to be shown to create the inference of negligence against the owner of a device through the medium of which another person is injured. California cases have frequently stated that the doctrine of *res ipsa loquitur* may apply "when a thing which causes injury is shown to be under the management of the defendant and the accident is such as in the ordinary course of things does not happen, if those who have the management use proper care, it affords reasonable evidence, in the absence of explanation by the defendant, that the accident arose from a want of care." (19 Cal. Jur. 704, sec. 123.) This doctrine prescribes a mere rule of evidence. The requirement that the instrumentality must be under the management and control of the defendant, in the application of the doctrine of *res ipsa loquitur,* does not mean, nor is it limited to, actual physical control. It has been held to apply to the mere *right of control* of the instrument which causes the injury at the time of the accident. (*Van Horn* v. *Pacific Refining & Roofing Co.*, 27 Cal. App. 105, 109 [148 Pac. 951]; *McCloskey* v. *Koplar*, 329 Mo. 527 [46 S. W. (2d) 557, 92 A. L. R. 641]; 38 Am. Jur. 997, sec. 300.) In the Van Horn case, *supra*, it is said in that regard:

"The rule declared in this and the other cases cited by appellant, to the effect that the exclusive control and management of the appliance causing the injury must be shown to have been in the defendant, must be taken to refer *to the right of such control;* otherwise, as we have seen, the doctrine of *res ipsa loquitur* could seldom if ever be given application." (Italics added.)

And in the text of 38 American Jurisprudence, at page 997, it is likewise said in that regard: .

"The requirement that the instrumentality be under the management and control of the defendant does not mean, or is not limited to, actual physical control, but refers rather to the right of control at the time of the accident."

In the present case the railroad company had continuous exclusive control over the motor car. The defendant's motor car mechanic, who was employed for that express purpose, actually repaired and adjusted that particular machine before it was delivered to Mr. Metz. It was the mechanic's duty to keep it in suitable repair. The deceased had no duty or authority to repair or keep that machine in proper mechanical condition. The real cause of the accident was the defendant's adjustment of the guide-wheels on that car in such a manner as to render it dangerous to operate it backward. We assume the jury found that the car was turned over to the deceased in that defectively-adjusted condition without warning him of the danger. It was the duty of the railroad company to supply Mr. Metz with a motor car which was reasonably suitable and safe for operation in the usual manner that such cars are used. If the machine was not constructed or intended to be propelled backward the workman should have been so informed.

We find no substantial evidence to support respondent's theory that the accident was caused by the existence of a low joint of the rails or any other defective condition of the track.

We are satisfied the evidence does not show facts which will relieve the defendant from liability for negligence on the ground of the assumption of risk on the part of the deceased. The doctrine of assumption of risk has no application when the workman is injured in the performance of his duties in the customary manner, through a dangerous and defective machine which is negligently provided for his use by the employer, if the workman has no knowledge of the defect. (*Gila Valley G. & N. Ry. Co.* v. *Hall*, 232 U. S. 94 [34 S. Ct. 229, 58 L. Ed. 521] ; 45 U. S. C. A. 381, sec. 53, subd. 4, note; *Crabtree* v. *Western Pac. Ry. Co.*, 33 Cal. App. (2d) 35, 43 [90 P. (2d) 835].) In the case last cited the court quoted with approval from the Gila Valley G. & N. Ry. Co. case, *supra,* as follows:

"An employee assumes the risk of dangers normally in-

cident to the occupation in which he voluntarily engages, *so far as these are not attributable to the employer's negligence.* But the employee has a right to assume that the employer has exercised proper care with respect to providing a safe place of work, *and suitable and safe appliances for the work,* and is not to be treated as assuming the risk arising from a defect that is attributable to the employer's negligence, until the employee becomes aware of such defect, or unless it is so plainly observable that he may be presumed to have known of it.'' (Italics added.)

The alleged contributory negligence of the deceased is not a defense to this action, which is maintained under the Federal Employers' Liability Act. Contributory negligence does not defeat the cause of action. If the deceased was guilty of contributory negligence in operating the motor car backward, and recovery is not barred by the doctrine of ''assumption of the risk,'' then the jury was authorized to merely reduce the damages accruing from defendant's negligence ''in proportion to the amount of negligence attributable to such employee,'' on account of his contributory negligence. (45 U. S. C. A. 379, sec. 53.) The jury was fully and fairly instructed in that regard. We must assume that if the jury believed the deceased was guilty of contributory negligence, it properly reduced the ascertained damages, in accordance with the admonition of the court, and pursuant to the provisions of section 53 of the act above cited.

The appellant was not prejudiced by the giving of plaintiff's instruction number sixteen which, in effect, merely advises the jury that the administratrix of the estate of a workman who has been killed in the course of his employment, under the provisions of section 51 of the Federal Employers' Liability Act, may maintain an action for damages against the employer in behalf of the widow and children of the deceased person. The appellant complains of that instruction because it omits to specifically state that the railroad company is liable for damages only in the event of proof of its negligence.

The jury was previously repeatedly and clearly told the burden was on the plaintiff to show by a preponderance of evidence that the deceased was killed in the course of his employment by the Southern Pacific Company as the proximate result of the negligence of the company or its agents, or their verdict must be rendered in favor of the defendant.

Following these admonitions several instructions were given in a group upon the specific application of the Federal Employers' Liability Act to the facts of this case. These instructions were separated only by Roman numerals which, we assume, were not even read to the jury. The jury had no means of knowing these charges upon the subject of the application of the Federal Employers' Liability Act were not all a part of one instruction on that general subject. The context of those instructions clearly identifies them as a continuous charge on the same subject-matter. The jury could not have been misled by the challenged instruction. Immediately preceding that criticised instruction the jury was charged as follows:

"Plaintiff's cause of action is based upon the act of Congress known as the Federal Employers' Liability Act and the statute of the United States governing the same reads as follows:

" 'Every common carrier by railroad while engaging in commerce between any of the several states or territories . . . shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce, . . . for such injury or death *resulting in whole or in part from the negligence of any of the officers, agents or employees of such carrier,* or by reason of any defect or insufficiency *due to its negligence,* in its cars, engines, appliances, machinery, track, roadbed, works, . . . or other equipment.' " (Italics added.)

The foregoing instruction clearly and unequivocally informs the jury that liability exists only when the injury or death results from the *negligent* acts of the defendant in supplying the dangerous or defective machine or appliance to the workman. All that the criticised instruction adds to that statement of principle is that the administratrix or other representative of the estate of the dead man may maintain the action for damages in behalf of the widow or children.

We find no reversible error in the charge to the jury.

The judgment is affirmed.

Steel, J. pro tem., and Tuttle, J., concurred.

A petition for a rehearing was denied May 15, 1942, and appellant's petition for a hearing by the Supreme Court was denied June 11, 1942. Edmonds, J., and Traynor, J., voted for a hearing.