[Civ. No. 15204.   Second Dist., Div. Three.   Aug. 1, 1946.]

DORIS RAFTER, a Minor, etc., Appellant, v. DUBROCK'S RIDING ACADEMY (a Corporation), Respondent.

Anderson & Adam for Appellant.

Reed & Kirtland for Respondent.

DESMOND, P. J.—Plaintiff, a minor 20 years of age, brought suit by her guardian *ad litem* to recover damages for personal injuries sustained by her on March 31, 1944, when the saddle on the horse which had been rented from

the defendant corporation fell off, carrying her with it and precipitating her to the ground. The hearing was begun before a jury and at the conclusion of plaintiff's case defendant moved for a nonsuit. This motion was granted, the trial judge saying that he did not think plaintiff had "proven either a res ipsa loquitur case or a case of simple negligence." From this judgment of nonsuit plaintiff prosecutes the instant appeal.

The complaint charged that on March 31, 1944, the defendant corporation was engaged in the business of operating a riding academy at 3224 Riverside Drive in the city of Los Angeles to which the public was invited for the purpose of renting and riding saddle horses for a certain price per hour; that on that date plaintiff rented from defendant a saddle horse equipped for pleasure riding; that defendant through its employees "so carelessly and negligently harnessed, saddled and equipped said horse rented by the plaintiff, that while plaintiff was riding said horse on the bridle paths in Griffith Park, the saddle on the horse turned and fell off, throwing plaintiff to the ground with great violence," causing her to sustain serious injuries, etc.

Plaintiff testified that about 5 o'clock in the evening of March 31, 1944, she was one of a party of approximately 20 employees of the Lockheed Aircraft Corporation who had rented riding horses from the defendant, the riding party having been previously organized and arranged for by Miss Lila Reaves, a coemployee of plaintiff. Plaintiff had never ridden a horse prior to this occasion. On the date mentioned the horses already saddled and fully equipped, were brought out into the courtyard, where the group had congregated, plaintiff being assigned the mare, "Harmony Ann," on which was equipped a Western saddle, a type customarily used by beginners. With the assistance of an officer of the defendant corporation, Stanley West Dubrock, plaintiff mounted her horse. She testified that no one gave her any instructions as to how to handle the mare before mounting but that "after I was on the horse . . . [t]he man that helped me showed me how to put my feet in the stirrup," he adjusted the stirrup and then "did something to the saddle underneath the horse." After the entire group had mounted they proceeded across the street from defendant's riding academy and onto the bridle paths of Griffith Park. Plaintiff rode for approximately "a half hour" without any trouble, during

which period she did not run her horse, the pace being "more than a walk but less than a run." In relating the details of her fall, the plaintiff stated that she noticed the saddle slipping shortly before she was thrown from the horse; that "right before I fell, the horse started to going pretty fast and . . . I pulled on the reins and held on to the horn and he wouldn't stop, so it just started to turn. . . . He just kept running. . . . Q. . . . When did you first feel the saddle start to turn? A. About five minutes before it did turn completely. . . . Q. Did your body go with the saddle? A. Yes." The court inquired, "Well, were you aware of the fact that the saddle was slipping for the full five minutes before you hit the ground?" The witness answered, "No," and finally testified that she felt the saddle slipping for approximately ten seconds. Plaintiff testified further that she was unable to get up and that certain members of the party picked her up and immediately took her to the hospital; that the horse ran away and she never saw it after that. She further testified that at no time during the riding trip did she get off the horse, nor did anyone adjust or do anything to the saddle or any other portion of the horse's equipment; that while certain members of the party stopped and dismounted once during the trip at a drinking fountain she remained on her horse. On cross-examination plaintiff testified that she never "ran the horse"; that when she became aware that the saddle was slipping, the horse "just kept on running"; that she did not call to anyone. "Q. And the only explanation you have for falling off was that the saddle slipped to the right? A. That's right. Q. You observed nothing else wrong in your equipment; is that right? A. No."; that her horse at no time appeared to be warm or perspiring.

Mrs. Melva Dubrock Ballard, office manager of the defendant corporation, called under section 2055, Code of Civil Procedure, testified that "Harmony Ann," ridden by plaintiff, was saddled with a Western saddle and that the saddle was equipped with a cord cinch made of cotton cord "with a loop on either end, or a ring on either end"; that it had no buckle on it but "was tied in a regular knot"; that the cinch holds the saddle on the horse's back; that a cord cinch was used by her organization on all Western saddles.

Plaintiff called as an expert witness, Nathan Alonzo Meek, who testified he had had 40 years' experience with horses and saddles. In describing a cinch this witness stated that some

are "made of leather and some are made of mohair; some are made of hair, horse's hair and some are made of cord 23 or 24 inches with a buckle at one end and if you leave the latigo drop—— THE COURT: You place the saddle on the horse's back over the blanket and then you reach underneath and pull the cinch strap through the right-hand side of the hook or ring to the left hand side and then cinch it up tight. A. Pull the latigo strap through the ring of the cinch and to the rigging of the saddle and that has a buckle and you have the strap fastened to the rigging of your saddle. Q. And the thing is to get it reasonably tight so the saddle will remain firm but not so tight as to have the horse in pain? A. That's right." In explaining the process of cinching a horse, this witness stated that "a horse taken from the barn or the corral, that has been fed and watered will have a tendency to bloat and when the saddle is put on them and they are cinched relatively tight, anywhere from maybe five minutes to one hour that horse will go back to normal and that will have a tendency to loosen the cinch. Q. In other words, the belly of the horse shrinks. A. That's right; after a horse has been moved or rode, some horses have a tendency to swell up with air after you cinch them. . . . Q. . . . What is the natural conduct of a horse when he feels the saddle slipping? . . . Q. Well, various horses act in various ways; one horse may become frightened and go to bucking and another one may go to running and another one may stop and stand still so that what a horse will do nobody knows. Q. If the cinch is tight on the horse will the saddle slip? . . . Q. Well, there is a lot of things will enter into that depending on the shape of the horse's back, the shape of the tree of the saddle and how tight the animal was cinched."

Stanley West Dubrock, called under section 2055, Code of Civil Procedure, stated that he was an officer of the defendant corporation and in the "business of renting saddles and horses to people for their riding" and "teaching pupils how to ride"; that on this particular day he rechecked the saddle and equipment on "Harmony Ann" when plaintiff was on the horse; that he checked every horse in the group; that a cord cinch was used on "Harmony Ann"; that he tested the cinch after plaintiff got on the horse and that it was in "perfect shape." In answer to the query, "And does she ["Harmony Ann"] have a broad back or a narrow back?", answered, "Well, she just has a nice combination that any horse-

man would like,'' and that she was not deformed in any way whatsoever.

Miss Reaves, called by the plaintiff, stated that she had organized the party; that during the ride, so far as she knew, none of the party raced his or her horse; that during the ride plaintiff ''was in sight where I could see her''; that plaintiff did not race, run or gallop her horse; that she did not see plaintiff fall off the horse ''there's a little curve after that point where we left and she was just past that curve and I came around the point just after she fell,'' but ''saw her when she was on the ground and the boys were just about to pick her up''; that she saw the horse ''running and one of the fellows was going after it''; that the saddle was on the ground and one of the boys picked it up and put it on the fence; that Mrs. Ballard was the lady at defendant's riding academy from whom she rented the horses and to whom she gave the names of the members of the party; that Mrs. Ballard ''asked me those that had not ridden''; that she told Mrs. Ballard that plaintiff was an inexperienced rider.

█ Plaintiff contends that under the doctrine of res ipsa loquitur she presented a prima facie case and was, therefore, entitled to have defendant put to its defense. Respondent claims that the doctrine has no application, the principle argument being that the ''vital element of *control* is absolutely lacking in the case at bar.''

In the recent case of *Ybarra* v. *Spangard,* 25 Cal.2d 486, it is said (p. 489) [154 P.2d 687]: ''The doctrine of res ipsa loquitur has three conditions: '(1) the accident must be of a kind which ordinarily does not occur in the absence of someone's negligence; (2) it must be caused by an agency or instrumentality within the exclusive control of the defendant; (3) it must not have been due to any voluntary action or contribution on the part of the plaintiff.' (Prosser, Torts, p. 295.)''

As to condition (1), it is apparent that in the instant case the accident ordinarily would not have occurred in the absence of negligence on the part of someone. As to condition (3), there is nothing in the record to indicate that this accident was due in any degree to the voluntary action or contribution on the part of plaintiff. She did not race the mare or otherwise improperly use her; she did not handle the saddle or interfere with it in any way; the saddle was not adjusted by

anyone after leaving defendant's hands; and plaintiff's only explanation for her fall was that the saddle suddenly slipped off the horse, taking her with it. As to condition (2), the question arises as to whether the instrumentality, the saddle, can be said to have been under the exclusive control of the defendant. Since the defendant corporation was not present by any of its officers when the ride took place or when the saddle broke or slipped the only control which may be attributed to it might be called "constructive control," a term used by the court in *Ybarra* v. *Spangard, supra,* citing *Escola* v. *Coca Cola Bottling Co.,* 24 Cal.2d 453 [150 P.2d 436]. At page 458 of the latter case, the following appears: "Many authorities state that the happening of the accident does not speak for itself where it took place sometime after defendant had relinquished control of the instrumentality causing the injury. Under the more logical view, however, the doctrine may be applied upon the theory that the defendant had control at the time of the alleged negligent act, although not at the time of the accident, *provided* plaintiff first proves that the condition of the instrumentality had not been changed after it left the defendant's possession. (See cases collected in *Honea* v. *City Dairy, Inc.,* 22 Cal.2d 614, 617-618 [140 P.2d 369].) . . . The reason for this prerequisite is set forth in Prosser on Torts, *supra,* at page 300, where the author states: 'Allied to the condition of exclusive control in the defendant is that of absence of any action on the part of the plaintiff contributing to the accident. Its purpose, of course, is to eliminate the possibility that it was the plaintiff who was responsible.' "

In *Ybarra* v. *Spangard, supra,* where the doctrine was held applicable in a situation where an unconscious patient on an operating table sustained injuries to a healthy part of his body not subject to treatment, we find the following statement (p. 493): "An examination of the recent cases, particularly in this state, discloses that the test of actual exclusive control of an instrumentality has not been strictly followed, but exceptions have been recognized where the purpose of the doctrine of res ipsa loquitur would otherwise be defeated. Thus *the test has become one of right of control rather than actual control.* [Italics ours.] (See *Metz* v. *Southern Pac. Co.,* 51 Cal.App.2d 260, 268 [124 P.2d 670].) In the bursting bottle cases where the bottler has delivered the instrumentality to a retailer and thus has given up actual control, he will neverthe-

less be subject to the doctrine where it is shown that no change in the condition of the bottle occurred after it left the bottler's possession, and it can accordingly be said that he was in constructive control.''

Defendant maintains that it can be successfully argued that the accident could have been due to one of several causes for which the defendant is not responsible, saying that the ''evidence demonstrates from the mouth of plaintiff's own witness that the horse, by his own conduct, could have been a causative factor in permitting the saddle to become unloosened.'' But since operators of riding academies, holding themselves out to the public as having horses properly equipped for pleasure riding must, indeed, be aware of any peculiar propensities of their own horses and, in the exercise of due care.for the safety of their patrons, must take into consideration such matters as the proper time when their horses should be fed and watered as related to the time of saddling the horses, we believe the argument is without merit.

In any event the question whether the defendant had taken proper measures before saddling and had exercised the degree of care required of it, was a matter of defense, properly determinable by the jury.

In the ordinary course of things a saddle does not slip and fall if proper care has been used in cinching it on the horse. The fact that the saddle became loose in some way, causing it to fall, carrying plaintiff with it, under the peculiar circumstances of the instant case, we think gives rise to an inference that the saddling was done either in a careless or improper manner or that the equipment was in some way defective. (See *McComas* v. *Al. G. Barnes Shows Co.*, 215 Cal. 685, 697 [12 P.2d 630], where the doctrine was held applicable in an action for damages for personal injuries sustained by plaintiff when the howdah in which she was sitting on an elephant's back slipped and fell to the ground.)

The judgment is reversed and the cause remanded for a new trial.

Shinn, J., and Wood, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied September 19, 1946. Edmonds, J., voted for a hearing.