[Civ. No. 15286. First Dist., Div. One. Jan. 30, 1953.]

DAISY C. BLACK et al., Respondents, v. CLARA F. PARTRIDGE, Appellant.

Charles A. Christin and Wallace W. Scales for Appellant.

Sturgis, Den-Dulk, Douglass & Henes, E. Hugh Henes, and Rankin, Oneal, Luckhardt, Center & Hall for Respondents.

PETERS, P. J.—Plaintiffs are the wife and adult son of Bruce Black. Defendant owns and operates a rooming house, in which Black was a lodger. Black was asphyxiated while

operating an unvented gas heater located in his room. In this action for his wrongful death the jury brought in a verdict for plaintiffs. Defendant appeals, contending that serious and prejudicial error occurred in the giving of certain instructions.

In November, 1949, appellant rented a room in her lodging house to Black for $6.00 per week. No maid or janitor service was furnished, but appellant had access to the room at all times. The rooming house was heated with 12 Rado gas heaters, which had been installed prior to 1939. In decedent's room his heater was the sole source of heat. This type of heater is no longer manufactured. It had been originally designed for manufactured gas rather than natural gas, with which it was being operated at all times here relevant. More air is needed to secure a proper combustion of natural gas than is required with manufactured gas. In decedent's room there was a double window above the heater and another single window on the opposite side of the room.

These heaters are constructed without an attachment for an outside vent. The burner is at the bottom of the heater. The heat and flames are supposed to pass through a combustion chamber in the back of the heater. In the course of their journey the gas passes through a retort in which there are supposed to be several sticks of a chemical compound called "Fumo," designed to absorb carbon monoxide and sulphur fumes. The chemical is supposed to be placed in a wire basket placed in the retort. Unless the chemical is placed in the basket, when it starts to disintegrate with use it will clog the outlets and adversely affect combustion. This chemical comes in small cylinders. If the heater is properly adjusted, a basket full of these pellets will absorb the carbon monoxide, but the chemical has to be watched because with use the cylinders tend to disintegrate or become dirty, and thus become less efficient.

When there is proper combustion the gas flame burns in a distinct violet blue cone. As combustion becomes less efficient, with a consequent increase in carbon monoxide, the cone becomes longer and indistinct and the flame turns yellow.

Appellant testified that about four years before the trial she had 24 to 36 boxes of "Fumo" on hand, and at that time had been able to purchase a dozen more boxes. At the time of trial she still had three or four boxes on hand. Apparently, the chemical is difficult to secure.

The appellant assumed the responsibility of servicing these heaters. Each basket requires about one box of the chemical, and appellant testified that she would fill each basket about once a year. She denied that the chemical would disintegrate with use, but admitted that it would get covered with soot. She testified that a P.G.& E. mechanic first showed her how to operate these heaters, and, later, that a plumber, who died before the date of the accident here involved, frequently assisted her in making adjustments to the needle valve and air control. Thereafter, she made the adjustments. She also testified that whenever a new tenant moved in she checked the adjustments on his heater, watched him operate it, and instructed him as to its operation. She would occasionally check the controls, and always checked them when a heater was moved for painting. These adjustments, intended to regulate properly the flow and proportions of gas and air, were made with a screwdriver.

Appellant testified that when decedent first rented his room she showed him how to light the heater, explained to him the location and purpose of the chemical, and warned him not to water it. She testified that she lit the heater for him and warned him that if the chemical became dirty the carbon monoxide might "jump" the chemical. Another tenant, Miners by name, who occasionally assisted appellant, and who was present when the room was rented to decedent, testified that he also told decedent how to operate the heater. He also testified that sometime before Christmas of 1949 he was in decedent's room and saw him stuff paper in the holes in the bottom of the heater apparently in an attempt to increase the heat, but that decedent immediately removed the papers when advised to do so by the witness.

In the first week of January of 1950 decedent took a short vacation to visit his family in San Jose. During his absence the room was painted. Before decedent left he told the painter that the heater did not throw out enough heat and that he was continually cold. The painter promised that he would see to it that the heater was checked and adjusted. The painter also testified that during decedent's absence he painted the room and disconnected and painted the heater, and then connected the heater up again. Appellant, in his presence, checked the heater and found that the flame was much too high. Appellant called the painter's attention to the high flame, reset the adjustments, and complained that gas bills were too high, stating: "Boy, a six dollar room,

and a $20 gas bill.'' The painter also testified that after he had connected the heater he saw appellant dump out the chemical and refill the retort in the back of the heater. Appellant testified that she emptied the basket before the heater was disconnected and filled the basket with ''Fumo'' after it was painted and connected.

When the decedent returned from his vacation the painting equipment was still in his room. The painter testified that decedent told him that the heater was still not throwing out enough heat, and stated that he had adjusted it himself. The painter warned decedent that appellant wanted no one but herself to adjust the heaters.

Appellant testified that the painter told her of this conversation, and that, about a week after decedent returned, she told decedent not to tamper with the heater, and that if he continued to do so she would remove the heater or decedent would have to leave the house. She further testified that after that conversation she again reset the adjustments on the heater so that it burned with a proper blue flame instead of a yellow flame. This was the second week of January.

January 26, 1950, was a cold day. On the morning of January 27th a tenant reported to appellant that the light had been on in decedent's room all night. Appellant found that the door to the room was bolted from the inside. Tenant Miners, at her request, then forced open a window and crawled into the room, and opened the door to admit appellant. Decedent, half undressed, was lying face down on the floor near the heater, dead. Miners testified that when he entered the room the heater was going wide open, with flames shooting out of its top, and that he shut it off, but made no other examination of it. The room smelled far from fresh. An autopsy fixed the cause of death as carbon monoxide poisoning. The autopsy surgeon testified that except for such poisoning, the autopsy disclosed decedent had been in normal health.

Dr. Lewis, an industrial medicine and toxicology expert, testified that carbon monoxide causes death because it combines with the hemoglobin of the blood many times more effectively than oxygen, that the victim is not aware of what is happening to him, and prior to death has no unpleasant symptoms. He further testified that every gas burner produces some carbon monoxide, and should not be kept burning for any substantial period unless vented, or unless it is

functioning properly, because otherwise it will pile up a deadly amount of carbon monoxide in a short period. He pointed out that the carbon monoxide is not in the gas, but is caused by improper combustion, and once formed will circulate about a heated room. Open windows would, of course, mean more ventilation, but would not necessarily prevent asphyxiation. If a gas heater is properly vented, or has a good absorbent, carbon monoxide poisoning is not probable, but an improper adjustment that merely results in a larger flame increases the danger. The absorbent container method is less efficient than outside venting.

Both Miners and appellant testified that all of the windows in the room were closed on the fatal night, except the window by which Miners gained admission, that window being open a crack. Miners was impeached in this respect by respondents to both of whom Miners stated that after the tragedy, two windows were open when he entered the room.

Respondents produced evidence to the effect that immediately after the accident the heater was in a defective condition. The daughter-in-law of decedent testified that she visited the room in question on the day of the inquest and then examined the heater. She found that the basket was not then in the retort and that the chemical was so disintegrated that she could see the bottom of the retort. A friend who accompanied this witness on this visit testified that he examined the heater, that there was no basket, and that the chemical in the retort was crumbled and very dirty. Appellant testified that she had not removed the basket.

This is a fair summary of the relevent evidence. On this evidence the trial court instructed, at the request of respondents, on the doctrine of res ipsa loquitur. Appellant contends that this was error, urging that as landlord she owed no duty to decedent, and that under the evidence she did not have exclusive control of the heater.

Appellant urges that, under the standard rules applicable to the landlord-tenant relationship, she can be held liable to her tenant only for a failure to disclose defects of which she had actual knowledge, and that concealment of defects not readily discoverable by the tenant's inspection is an essential element of responsibility. Therefore, so she contends, there being no evidence of these facts, she owed no duty to decedent.

The extent of a landlord's duty, in some circumstances, is as stated by appellant, at least as to nonfeasance. (*Daulton*

v. *Williams,* 81 Cal.App.2d 70 [183 P.2d 325]; *Dorswitt* v. *Wilson,* 51 Cal.App.2d 623 [125 P.2d 626]; *Sherrard* v. *Lidyoff,* 108 Cal.App.2d 325 [239 P.2d 28]; *Powell* v. *Stivers,* 108 Cal.App.2d 72 [238 P.2d 34].) It could be argued that the evidence, although conflicting, does show "concealment" of a hazardous condition in that the appellant knew or should have known of the condition of the chemical, and concealed the fact that the basket in the retort had been removed, and that the chemical was disintegrated. ■ Regardless of this theory, however, it is also the law that a landlord may be liable to his tenant for misfeasance in negligently performing a task that he has assumed. In such case he owes a duty to the tenant to perform such task with reasonable care. (*Janofsky* v. *Garland,* 42 Cal.App.2d 655 [109 P.2d 750]; *Callahan* v. *Loughran,* 102 Cal. 476 [36 P. 835]; *Nelson* v. *Myers,* 94 Cal.App. 66 [270 P. 719]; *Singer* v. *Eastern Columbia, Inc.,* 72 Cal.App.2d 402 [164 P.2d 531]. See annotation in 18 A.L.R.2d 973, particularly at pp. 980-981, for cases dealing with duty of due care in connection with heating fixtures.) ■ Here the evidence produced by respondents shows that as part of the contract of letting, the landlord undertook to maintain, adjust and service the heater, and that one of the defects—improper maintenance of the retort box in the back of the heater—was not an obvious one. Appellant owed a duty to decedent to use reasonable care in maintaining the heater.

■ In this state there also is a statutory duty of due care imposed upon landlords to maintain such heaters in a reasonably safe condition. Section 16905 of the Health and Safety Code, which is part of the State Housing Act, imposes on landlords the following duty: "Every gas vent, gas water heater, or other gas appliance shall be maintained in good repair."* Decedent was obviously a member of one of the classes for whose benefit this statute was passed. Thus the requirement that the defendant, before the doctrine of res ipsa loquitur is applicable, must owe a duty to the plaintiff, was fully met in the instant case.

■ But, says appellant, another factor that must exist before the doctrine is applicable is control in the defendant

---

*It should be noted that today this duty is much more stringent. In 1951, which was after the date of the accident here involved so that the amendment is not applicable, § 16900 of the Health and Safety Code was amended to require all gas burning appliances, with certain exceptions not here applicable, to be vented to the outside.

over the instrumentality. This is a most confusing concept. As Dean Prosser has so clearly pointed out in his article on Res Ipsa Loquitur in California (37 Cal.L.Rev. 183, at p. 199, et seq.), the courts have held that all that is required is that the defendant exercise some control over the article involved in the accident or exercise a right of control. Once it is shown that defendant had some degree of control over such agency, then it is for the jury to say whether it is more probable that defendant's negligence caused the accident or not.

It is appellant's theory that the evidence shows that decedent exercised some control over the adjustments on the heater and that he controlled the ventilation of the room. The heater was in his possession, and appellant points out that there is no evidence that he did not tamper with the adjustments prior to death, and that there is some evidence that he did so. Those are factors that have been declared to be important in some factual situations. (*Meyers* v. *G. W. Thomas Drayage & R. Co.*, 108 Cal.App.2d 529 [239 P.2d 118] ; *Honea* v. *City Dairy, Inc.*, 22 Cal.2d 614 [140 P.2d 369] ; *Gordon* v. *Aztec Brewing Co.*, 33 Cal.2d 514 [203 P.2d 522].)

But the more recent cases on this subject recognize the principle that the existence of the conditions upon which the operation of the doctrine is to be predicated is a question of fact, and carefully preserve the right of the jury to find those facts. (See *Rose* v. *Melody Lane*, 39 Cal.2d 481 [247 P.2d 335] ; *Knell* v. *Morris*, 39 Cal.2d 450 [247 P.2d 352] ; *Milias* v. *Wheeler Hospital*, 109 Cal.App.2d 759 [241 P.2d 684].)

These principles apply to the question of the degree of control that must be exercised before the doctrine is applicable. (*Zentz* v. *Coca Cola Bottling Co.*, 39 Cal.2d 436 [247 P.2d 344] ; *Rose* v. *Melody Lane*, 39 Cal.2d 481 [247 P.2d 335] ; see, also, *Hinds* v. *Wheadon*, 19 Cal.2d 458 [121 P.2d 724] ; *Rafter* v. *Dubrock's Riding Academy*, 75 Cal.App.2d 621 [171 P.2d 459] ; *Metz* v. *Southern Pac. Co.*, 51 Cal.App.2d 260 [124 P.2d 670].)

How do these principles apply to the instant case? There is some evidence that without proper venting the heater would be dangerous, and that absorption by the chemical method was less satisfactory than outside venting. There is also evidence that, even with the windows partially open, if the chemical was insufficient or dirty or disintegrated, enough carbon monoxide could be created to be deadly. There is evidence to the effect that defendant had control of the chemical, that

the chemical basket had been removed, and that the chemical in the retort was disintegrated. It is, of course, true that all we positively know is that death was caused by carbon monoxide poisoning, and that such resulted from the burning of the heater. There are three reasonable probabilities which alone or in combination could have caused the accident. The heater could have been improperly adjusted, or the room could have been inadequately ventilated, or the chemical was insufficient. It was for the jury to say which of these three probabilities, or any combination of them, under the evidence, was the most reasonable. While decedent had the opportunity to tamper with the adjustments on the heater, and there is evidence that he did so, and while he, of course, controlled the room's ventilation, the accident could have been caused by defective chemical replacement. Under such circumstances, the respondents were entitled to res ipsa loquitur instructions. Under the evidence the jury could find, aided by the inference permitted by the res ipsa loquitur instruction, that the reasonable probability was that appellant was negligent in replenishing the chemical, that the chemical was placed in the retort instead of the basket, that the chemical was disintegrated and insufficient, and that death was caused by these acts.

 It cannot be successfully urged that, because respondents introduced some evidence as to the probable cause of the accident and as to appellant's negligence, they are deprived, as a matter of law, of the benefit of the inference permitted under the res ipsa loquitur doctrine. That evidence supports the inference, and vice versa. It is common sense, and well supported by authority, that, where the plaintiff introduces some circumstantial evidence as to the cause of an accident, he is still entitled to the inference as long as the inference may still be drawn in support of the specific proof. (*Leet* v. *Union Pac. R. R. Co.*, 25 Cal.2d 605 [155 P.2d 42, 158 A.L.R. 1008] ; *Doke* v. *Pacific Crane & Rigging, Inc.*, 80 Cal. App.2d 601 [182 P.2d 284] ; *Brunig* v. *Pacific Gas & Elec. Co.*, 140 Cal.App. 254 [35 P.2d 226] ; *Kilgore* v. *Brown*, 90 Cal. App. 555 [266 P. 297] ; *Mansfield* v. *Pickwick Stages, Northern Div.*, 68 Cal.App. 507 [229 P. 890] ; Prosser, Res Ipsa Loquitur in California, 37 Cal.L.Rev. 183, at p. 212.)

Appellant next objects to the form of the instructions given on res ipsa loquitur. There is merit to this contention. The instructions given were taken from B.A.J.I., and have been

the subject of frequent discussion and criticism. They are as follows:

"From the happening of the accident involved in this case, as established by the evidence, there arises an inference that the proximate cause of the occurrence was some negligent conduct on the part of the defendant. That inference is a form of evidence, and if there is none other tending to overthrow it, or if the inference preponderates over contrary evidence, it warrants a verdict for the plaintiffs. Therefore, you should weigh any evidence tending to overcome that inference, bearing in mind that it is incumbent upon the defendant to rebut the inference by showing that she did, in fact, exercise ordinary care and diligence or that the accident occurred without being proximately caused by any failure of duty on her part, or by contributory negligence of decedent himself.

"The instruction just given may appear to constitute an exception to the general rule that the mere happening of an accident does not support an inference of negligence. The instruction, however, is based on a special doctrine of the law which may be applied only under special circumstances, they being as follows:

"First: The fact that some certain instrumentality, by which injury to the plaintiff or decedent in this case was proximately caused, was in the possession and under the exclusive control of the defendant at the time the cause of injury was set in motion, it appearing on the face of the event that the injury was caused by some act or omission incident to defendant's management.

"Second: The fact that the accident was one of such nature as does not happen in the ordinary course of things, if those who have control of the instrumentality use ordinary care.

"Third: The fact that the circumstances surrounding the causing of the accident were such that the decedent or his heirs are not in a position to know what specific conduct was the cause, whereas the one in charge of the instrumentality may reasonably be expected to know, and be able to explain, the precise cause of the accident.

"When all these conditions are found to have existed, the inference of negligence to which they give birth will support a verdict for the plaintiffs, in the absence of a showing by defendant that offsets the inference."

There can be no doubt that the first paragraph of this instruction is ambiguous, confusing and somewhat contradicts

the last part of the quoted instructions. We recently had occasion to review this instruction in *Hardin* v. *San Jose City Lines, Inc.,* (Cal.App.)* 252 P.2d 46. It was there held that the giving of the first instruction above quoted, under the facts there involved, in a carrier case, was not prejudicial error, but the several reasons why the instruction is unsound are discussed at length in that opinion. What was there said on that subject need not be repeated here. We also there stated at page 50 of 252 P.2d: ."While here, for the reasons aforesaid, we find no prejudice in the giving of this instruction, it nevertheless is a dangerous one to give, particularly in a case where, different than here, a common carrier is not involved. It does leave open the possibility that it might be construed to mean that the court is stating that an accident happened and that the inference is compulsory. . . . The instruction should not be used."

The vice of the instruction is, of course, as pointed out in the Hardin case, *supra,* that apparently it makes the indulging in the inference mandatory and not permissive. That is not prejudicial in a carrier case where the best reasoned cases hold that the effect of res ipsa is to shift the burden of proof to defendant. ▮ But that is not true in a case between private individuals. In such case the inference is permissive and not mandatory. ▮ The instruction, however, states that from the happening of the accident "there arises an inference," that the jury should weigh any evidence "tending to overcome that inference," and that it is incumbent on the defendant "to rebut the inference." That language is mandatory language, and to a layman might very well indicate that upon proof of the accident the inference arises and the burden of proof shifts to defendant. That is, of course, not the law. There are several cases where the instruction has been criticized but held not to be prejudicial. Thus in *Gordon* v. *Aztec Brewing Co.,* 33 Cal.2d 514 [203 P.2d 522], the error was held to be nonprejudicial, but in that case an additional instruction was given requiring the plaintiff to prove that the instrumentality had not been tampered with after it had come into plaintiff's possession. No such instruction was here given. (See, also, *Freitas* v. *Peerless Stages, Inc.,* 108 Cal.App.2d 749 [239 P.2d 671]; *Hinds* v. *Wheadon,* 19 Cal.2d 458 [121 P.2d 724]; *Meyers*

---

*A hearing was granted by the Supreme Court on March 12, 1953.

v. *G. W. Thomas Drayage & R. Co.*, 108 Cal.App.2d 529 [239 P.2d 118]; *Radisich* v. *Franco-Italian Packing Co.*, 68 Cal. App.2d 825 [158 P.2d 435]; *Welch* v. *Sears, Roebuck & Co.*, 96 Cal.App.2d 553 [215 P.2d 796].) In *Milias* v. *Wheeler Hospital*, 109 Cal.App.2d 759 [241 P.2d 684], it was held that the court properly refused to give the challenged instruction, and on the first appeal in the Zentz case—*Zentz* v. *Coca Cola Bottling Co.*, 92 Cal.App.2d 130 [206 P.2d 653] —the giving of the challenged instruction was held to be reversible error.

The instruction was also erroneous in the instant case for another important reason. Under the evidence the heater was in the physical possession of the decedent. He had the opportunity to tamper with the adjustments, and there is substantial uncontradicted evidence that he did so. Thus, an essential element of res ipsa loquitur was not present if the jury should find that the carbon monoxide was created by faulty adjustment. (See the second Zentz case—*Zentz* v. *Coca Cola Bottling Co.*, 39 Cal.2d 436 [247 P.2d 344].) The only condition under which res ipsa was applicable in the present case was if the jury should first find that the death was caused by a failure to maintain properly the chemical. But the instruction given was not so limited. It provided that the inference of negligence arose from the mere happening of the accident. If the jury should find that the accident happened from an improper adjustment, then no inference of negligence arose, because of the absence of the vital element of control in appellant. This error was obviously prejudicial and requires a reversal.

The judgment appealed from is reversed.

Bray, J., and Wood (Fred B.), J., concurred.