[Civ. No. 15891.   First Dist., Div. One.   Nov. 23, 1954.]

MARY POLIOUDAKIS, Appellant, v. CITY AND COUNTY OF SAN FRANCISCO et al., Respondents.

Stanley P. Mamalakis for Appellant.

Dion R. Holm, City Attorney, Edward F. Dullea and Robert M. Desky, Deputy City Attorneys, for Respondents.

PETERS, P. J.—Plaintiff, Mary Polioudakis, brought this action against the defendant city for damages for a claimed injury to her wrist, alleged to have been received as a result

of the negligence of the driver of the city-operated bus in which plaintiff was a passenger. The jury brought in a verdict in favor of the defendant. From the judgment entered on that verdict plaintiff appeals. Her two contentions are that, in view of the applicability of the res ipsa loquitur doctrine, the judgment for defendant is unsupported, and that the trial judge so conducted himself as to prejudicially deprive her of a fair trial.

The reporter's transcript discloses that the participants in the incident involved were in hopeless disagreement as to practically every material fact. Appellant not only disagreed with the bus driver as to how the accident occurred, but she and her main witness, another bus passenger, were in hopeless conflict as to what happened before, at the time of, and after the accident. The medical testimony was in direct conflict as to the extent of the injury suffered, and as to whether, in fact, any injury at all was suffered by appellant while riding in the bus. In several respects appellant's testimony contradicted the verified allegations of her complaint, was frequently evasive, and in some respects demonstrably false.

Appellant, on the afternoon of April 30, 1949, boarded a city-operated bus at Geneva and Mission Streets in San Francisco. This bus was operated by one Thompson, who had been driving this route for over six months. Appellant testified that she seated herself in the second seat from the rear, next to the window, and facing the driver. Her location was verified by the testimony of a Mrs. McGrath, who claims to have been seated across from appellant. In her verified complaint appellant had averred that before she had gained a position of safety in the bus it lurched so as to propel her against an upright stanchion. This position was abandoned at the trial.

Appellant testified that the bus was not crowded, that there were only "a few people, not—seven or ten people, I guess. I don't remember exactly how many, but not very many" in the bus when she entered. Mrs. McGrath testified that "it was a full bus" but the bus "wasn't full, so there wasn't anyone standing. There were empty seats." Thompson testified that the bus was fully loaded with a few people standing in the aisle, so that his view to the rear of the bus was obstructed.

Thompson testified that he started the bus and turned right from Geneva into Mission, his route requiring him to turn right again at the next corner which was Amazon Street;

that during that block he traveled at about 12 miles per hour, and slowed down to 5 to 7 miles an hour preparing to turn right into Amazon Street. Appellant testified that the bus was going 35 miles per hour during this block, while Mrs. McGrath fixes the speed at between 25 to 30 miles per hour. Thompson testified that in turning his 35-foot bus into Amazon it was necessary to cross over onto the wrong side of the white line dividing Amazon Street which is 36 feet wide; that as he was making the turn he saw an automobile approaching at 25 miles per hour or more on Amazon Street, about a block away; that to miss this oncoming car he cut the corner sharply so that his right rear wheel went up over the curb; that this and his easing this wheel off the curb caused the bus to rock a little. Appellant testified that she was looking ahead as Thompson started to make the turn and that there was no vehicle approaching, and that it was the right front tire that hit and jumped the curb. Mrs. McGrath's version of the incident was radically different. She testified that the incident occurred on Mission Street, 20 feet before the bus turned into Amazon Street, that the two front wheels of the bus jumped the curb, and that the bus ran up onto the sidewalk and came to a stop before reaching the Amazon Street intersection.

The witnesses do seem agreed that the result of the bus hitting and jumping the curb and returning to the street was a rocking of the bus, the witnesses differing as to the severity of this rocking motion. Appellant testified that, as a result of this rocking motion, she hit her left elbow and wrist on the side of the bus, causing a fracture of the wrist. Appellant and Thompson are agreed that, after jumping the curb, the bus did not stop but continued up Amazon Street. Thompson testified that none of his passengers seemed upset at the incident, and none complained to him at the time. He did state that he could not observe what was happening in the rear of the bus because of the standees.

Mrs. McGrath's account of the entire incident differs radically from that of appellant or of Thompson. Not only does she have the accident occurring on Mission Street with the bus coming to a stop with its two front wheels on the sidewalk, but she also testified that immediately after the rocking motion she observed appellant ''crunched down and her arm was under her''; that appellant was biting her lip and crying; that she observed that three other people were thrown from their seats; that many of the passengers voiced loud com-

plaints; that after the bus stopped, all of the passengers got out of the bus, and that she assisted appellant off the bus.

Appellant made no complaint to the driver until she had reached her destination, some five to seven minutes after leaving Mission and Amazon Streets. At that time she told the bus driver she had been hurt. Thompson testified that appellant told him she had hurt her left elbow, not her wrist. Both agreed that the bus driver asked her for her name and address and offered to call an ambulance, which offer was declined.

Appellant treated her injured arm by soaking it in Epsom salt baths on Saturday and Sunday, during which period there was pain but no swelling. She testified that on Monday she first visited an emergency hospital, but could not see a doctor, and then went to her own physician, Dr. Ryan. The doctor's records show that this visit occurred on Tuesday, May 3d. Dr. Ryan testified that the wrist and elbow were both swollen but neither was discolored, and that he ordered X-rays. The report of the X-ray specialist, Dr. O'Neil, was submitted to Dr. Ryan, and read by him at the trial. This report interpreted the X-rays as showing no elbow fracture, but as showing a spur, which indicated an arthritic process in the left elbow. These X-rays also showed an old healed fracture of the scaphoid, one of the 8 small bones of the left wrist, and an old healed fracture of the radius, a bone in the left forearm. The report also noted that "There has presumably been a fracture involving the semilunar, which shows practically a total collapse." The semilunar is another of the small wrist bones. Dr. Ryan testified that he interpreted this portion of the report to mean that the semilunar had been recently fractured, and by "recent" he meant anything from a few days to a few weeks. When asked why Dr. O'Neil had used the words "there has presumably been a fracture involving the semilunar," Dr. Ryan stated that sometimes bones collapse from disease, and that this was probably what Dr. O'Neil had in mind by this qualified statement. Dr. Ryan testified, however, that because of the history given him by appellant he assumed that the injury was traumatic. He immobilized the arm and wrist with a series of casts and had subsequent X-rays taken. The report on the X-rays taken on July 13, 1949, noted an old fracture of the os magnum, another bone in the left wrist, which fracture had been overlooked when examining the first X-rays.

The defense produced Dr. Sullivan as its expert. He had

examined the appellant and taken X-rays on November 7, 1950, some 18 months after the claimed injury. He testified that the functional operation of the wrist was limited, but believed, based upon observation of various factors, that this limitation was voluntary on the part of the patient and not involuntary. In comparing the May 3, 1949 X-rays with those taken in November, 1950, Dr. Sullivan pointed out that both showed a deformity in the radius and ulna, which he estimated was of 14 or 15 years' duration. The collapse of the semilunar described by Dr. Ryan might be a disease process rather than a fracture, although it could have been caused by trauma. He stated, however, that, had the semilunar suffered a crushing injury, the X-rays would have shown a diffusion, and of this there was no indication. He was of the opinion that the semilunar had undergone degeneration and deformity that was caused by disease, and supported his testimony by detailed explanations of what the various X-rays showed.

The appellant was most evasive about the old fractures shown by the X-rays, and about a subsequent injury suffered by her. Her verified complaint, signed by her, specifically alleged previous fractures to her left wrist. At the trial she could not at first remember any prior or subsequent injuries until reminded of an accident in a store in San Francisco in 1945 in which she had injured her left wrist or the fingers of her left hand, and for which she had been paid $400. On cross-examination she insisted that this injury was only to the fingers and not to the wrist. She denied any other injury until reminded that in October of 1950 she had filed a claim for an injury allegedly occurring at the Emporium, for which she had again collected $400.

This Emporium accident allegedly occurred some 17 months after the bus accident here involved. In this action appellant testified that she had suffered continuous and severe pain in her left wrist ever since April of 1949. In her deposition taken in the Emporium case she testified that prior to October of 1950 her left wrist was entirely free of pain. In fairness to appellant, however, although the point is not entirely free of doubt, it should be stated that there is some evidence that the claimed Emporium injury was to her right arm.

On this evidence the court properly instructed the jury on all issues involved, including the doctrine of res ipsa loquitur. The jury decided in favor of defendant and this appeal followed.

■ One of the two major contentions made by appellant is that, with the help of the doctrine of res ipsa loquitur, she established a prima facie case which, as a matter of law, was not rebutted. Hence, it is claimed, the judgment is unsupported. The point does not require serious consideration. While the evidence shows that appellant was a passenger in a bus that jumped the curb, the evidence also supports the implied finding of the jury that appellant was not then injured. The plaintiff must prove that an injury was received before the doctrine is applicable. (*Hardin* v. *San Jose City Lines, Inc.*, 41 Cal.2d 432 [260 P.2d 63] ; *Milias* v. *Wheeler Hospital*, 109 Cal.App.2d 759 [241 P.2d 684] ; *Black* v. *Partridge*, 115 Cal.App.2d 639 [252 P.2d 760].) The testimony of appellant, and of her principal fact witness, was so inconsistent and contradictory, and the medical evidence so conflicting, that the jury could have found that appellant suffered no injury on the date in question.

■ Moreover, even if the jury reached the point of accepting the fact of injury on the bus so as to raise the inference involved in res ipsa loquitur, that inference of negligence is simply evidence which can be rebutted, even by circumstantial evidence. (*Scott* v. *Burke*, 39 Cal.2d 388 [247 P.2d 313].) Here the jury could have found that in the face of unexpected danger Thompson acted without negligence. (*Leo* v. *Dunham*, 41 Cal.2d 712 [264 P.2d 1] ; *Reynolds* v. *Filomeo*, 38 Cal.2d 5 [236 P.2d 801].) Thus, the contention under consideration is without merit.

■ The other major contention of appellant is that the trial judge, by his conduct, prejudicially deprived her of a fair trial. It is urged that he was antagonistic toward appellant, in effect, persecuted her, and thus unfairly biased the jury against her. The appellant's briefs contain many excerpts from the evidence in claimed support of these charges. Most of these charges relate to questions asked by the court of the witnesses, and particularly of appellant. We have read the record. While there is no doubt that the judge frequently took it upon himself to interrupt the examination of appellant and some of her witnesses, and occasionally did make comments about the evidence, and while he may not have been a model of judicial patience, appellant was largely responsible for these occurrences. The appellant was a most evasive and confusing witness. She apparently tried to conceal the fact that she had suffered prior injuries to this arm. Certainly she tried to disparage the effect of these prior

injuries. She testified in several respects contrary to the allegations of her complaint which she had verified. The record shows that the judge attempted to bring out the truth. If that was injurious to appellant it was because the truth was injurious to her. The judge, of course, had the constitutional right to comment on the evidence. (Cal. Const., art. VI, § 19.) The judge is not simply a referee. Where a witness is evasive, contradictory or confused, he has the right and duty to try to clarify the answers. The situation disclosed by the record is very similar to that involved in *Karwoski* v. *Grant*, 30 Cal.App.2d 171 [85 P.2d 944], where, at page 178, it was stated: ". . . the uncertainty, evasiveness or reluctance of other witnesses warranted the court's intervention in their examination, though the court's interrogation in some instances might well have been deferred until respective counsel had completed their examination. In the face of the record here, we perceive no misconduct on the part of the judge." (See also *People* v. *Harmon*, 117 Cal. App.2d 511 [256 P.2d 340].) Moreover, during the trial the court gave two admonitory instructions to the jury to the effect that it was the jury's function to determine the truth or falsity of the evidence, and this was repeated in a full instruction on the problem given at the end of the trial. It should also be pointed out that appellant's counsel failed to assign any of these claimed errors as misconduct during the trial. This is significant. (*People* v. *Hill*, 116 Cal.App.2d 212 [255 P.2d 54]; *People* v. *Buratti*, 96 Cal.App.2d 417 [215 P.2d 500].) There was no error.

The judgment appealed from is affirmed.

Bray, J., and Wood (Fred B.), J., concurred.