[Civ. No. 15576.   Second Dist., Div. Three.   June 30, 1947.]

JAMES B. DOKE, SR., et al., Appellants, v. PACIFIC CRANE & RIGGING, INC. (a Corporation) et al., Respondents.

A. V. Falcone for Appellants.

Bauder, Veatch & W. I. Gilbert and Robert E. Ford for Respondents.

WOOD, J.—Plaintiffs, husband and wife, appeal from the judgment of nonsuit in this action for damages for the wrongful death of their son. The trial proceeded before a jury, and, after eight witnesses had testified on behalf of plaintiffs, counsel for plaintiffs stated to the court that he had concluded plaintiffs' case except for one expert witness who was unable to be present until the next day. He then made an offer of proof as to what the testimony of the witness would be. The court sustained defendants' objection to that offer of proof, and the defendants then made a motion for a nonsuit upon the ground that the evidence was insufficient to sustain any cause of action within the purview of the pleadings.

It appears from the evidence that the Lockheed Aircraft Company (hereinafter referred to as Lockheed) had caused to be constructed on its premises a metal incinerator approximately 30 feet high and 12 feet in diameter, on top of which a spark arrester was to be installed. The Acme Blower Pipe Company (hereinafter referred to as Acme) was in the business of making spark arresters, and had been engaged by Lockheed to manufacture one and install it on the top of the incinerator. After the spark arrester had been completed, Acme engaged the defendant Pacific Crane & Rigging, Inc. (hereinafter referred to as the defendant), to send a crane, and men to operate it, to the Lockheed premises for the purpose of lifting and placing the spark arrester on top of the incinerator. The spark arrester was made of sheet metal, was oval in shape, 3 to 4 feet high, 12 to 13 feet in diameter and weighed about $1\frac{1}{4}$ tons. Before it was moved from the Acme premises, Acme employees made a "sling," or device, to be attached as a kind of bail over the top of the arrester for the purpose of lifting it to the top of the incinerator. The sling was made by fastening an end of a steel chain through a loop at the end of a wire rope, and by fastening the other end of the chain to one side of the arrester, and the other end of the wire rope to the opposite side of the arrester. About two-thirds of the sling was made of chain, and one-third of the wire rope. The day the installation was to be made, May 26, 1944, the defendant sent a Universal truck crane (a crane mounted on an automobile truck), and two employees, defendants Phillips and Davis, to the Lockheed plant. Phillips was to operate the crane, and Davis was to oil it and drive the truck. The crane had a 50-foot boom (a projecting arm made of steel from which the hoisting tackle was suspended) which extended in front of the operator's cab. There were two

cable drums at the base of the boom, and two 10-inch "shives" (wheels with grooves for cables) at the upper end of the boom. A ⅝-inch steel wire cable extended from one of the drums, up the boom, through one of the 10-inch shives, then swung down to a loading block. The loading block contained one large wheel, similar to the shives, and the cable passed through the block, around the wheel and then back to the upper end of the boom and through another shive, then down again through the loading block and, apparently, up again through a shive in the upper end of the boom, down the boom, and around the other cable drum at the base of the boom. A "U" shaped hook, 6 to 8 inches in length, hung from the loading block, and objects to be lifted were attached to that hook. The boom was operated by two hand levers, one of which raised and lowered the boom, and the other swung the boom from side to side. A lever controlled the winding up and releasing of the cable which was on the drums. The crane was put into operation by means of clutch gears. A foot brake was used in stopping the operation of the crane, and it also controlled the speed with which an object was lowered. The brake consisted of a band around a drum. Pressure on the brake tightened the band around the drum and stopped the movement of the cable up the boom and down to the object, and stopped the movement of the object. To lower the object the operator released, or "eased off," on the brake. The spark arrester had been hauled to the Lockheed plant on a truck. Decedent, James B. Doke, Jr., an employee of Acme who was a sheet metal worker, had been sent to Lockheed to complete the installation of the spark arrester after it was in place on top of the incinerator. He climbed upon the truck which held the arrester, and Phillips, who was sitting upon a seat in the cab of the crane truck facing the boom, swung the boom over the truck and above the arrester. Decedent attached the hook, which was suspended on cables from the boom, to the sling on the arrester. Phillips then lifted the arrester 7 or 8 inches above the bed of the truck to test its balance. It was not properly balanced, and Phillips lowered it onto the bed of the truck. Decedent moved the hook to a different position on the sling, and Phillips again lifted the arrester from the bed of the truck. This was repeated four or five times before the arrester appeared to be in balance. It was then lowered to the ground, to the left of Phillips and a distance of 20 or 30 feet

from the incinerators. It was then lifted from the ground to a height of about 4 feet and held stationary while one Ruffner, an employee of Acme, at the direction of Phillips tied a hemp rope to the arrester. The rope was then held by Ruffner to prevent the arrester from turning around in the air. About this time the decedent ascended a steel ladder, which extended to the top of the incinerator and was welded to its side, to give signals to Phillips as to where to place the arrester on the incinerator. The arrester was lifted to a height of approximately 34 feet to a position above the incinerator. Phillips, following a signal by decedent, then began to lower it slowly toward the top of the incinerator. He had lowered it a few feet when decedent signaled for him to halt, and Phillips stopped the arrester about 1½ feet above the top of the incinerator. The arrester remained stationary in this position for 15 to 20 seconds when suddenly it dropped with a loud noise, in place, on top of the incinerator. Decedent, who was at the top of the ladder, fell to the ground and was killed. The complaint alleged, and defendants admit by their answer, that the arrester struck and killed decedent when it fell.

There was testimony by one Wood, an employee of Lockheed, who was called as a witness on behalf of plaintiffs, to the effect that he was present and watched the arrester being lifted above the incinerator; that as it was being lowered the arrester stopped for a moment and then dropped; that the movement in lowering the arrester was jerky; that the arrester struck decedent when it fell and knocked him from the ladder; that immediately after it fell the sling on the arrester was still looped over the hook; that the boom of the crane was at approximately a 45-degree angle after the arrester fell, but it did not snap or shake; that a Lockheed fireman climbed the ladder about half an hour after the accident, and took the sling off the top of the arrester and threw it to the ground; that he thought the man was the fire captain, and his name could be ascertained by consulting the personnel department of Lockheed.

Another employee of Lockheed, one Caster, who was called as a witness on behalf of plaintiffs, testified that he witnessed the operation from the time the hemp guide rope was attached to the arrester; that the arrester was lowered toward the incinerator in "sort" of a jerky manner; that when the arrester fell it struck decedent and knocked him off the ladder; that he could not help but see that neither the crane

nor the hook made any motion upward when the arrester fell; that after the accident he moved about the scene, and observed the arrester from the shipping platform which is about 41 feet high and a distance of about 75 feet from the incinerator; that the arrester was level on the incinerator after it fell and the sling was still attached to the hook; that he saw someone, who he thought was a fireman for Lockheed, climb the ladder after the accident and throw something to the ground.

Martin Colvin, general counsel for the defendant company, was called under section 2055 of the Code of Civil Procedure, and testified that the operation of a crane is the exclusive function of the operator, but that the customer directs the work to be performed.

Defendant Phillips, who was also called under section 2055 of the Code of Civil Procedure, testified that it was his duty to operate the crane; that no one had anything to do with operating the crane but the witness, and no one told him how to operate it; that the hemp guide rope did not affect the operation of the crane but made it easier to lift the arrester by preventing it from twirling; that the crane was "issued" to him and he operated the same crane all the time; that he inspected his own crane, and the only inspection made of it around the day of the accident was made by him; that he inspects his crane while he is operating it, and he would know whether a brake would hold or would not, and whether a cable was worn; that the length of the boom determines the weight the crane can lift; that the lifting capacity of his crane, the way it was hooked up on the day of the accident, was 6 tons; that he did not inspect the hook-up of the crane to the arrester; that he had no secondary or safety line; that he told one of the Acme men to tie the hemp rope to the arrester to keep it from "twirling," but he did not know where it was attached or how it was hooked up; that it took 2 or 3 minutes to lift the arrester and swing it over the top of the incinerator; that there was no slack in the cable, which held the arrester, and it was taut at all times; that he had his brake set and the "piece" locked; that when the arrester fell it did not tip but fell straight down; that he could not see from where he was "if the sling broke or the hook broke, or what caused the piece to fall"; that he could not see what happened from his seat on the crane; that he believed some part of Acme's hook-up came loose; that he did not examine

the arrester or sling either before or after the accident; and that the last time he saw the sling it was in the office of the defendant company. He also testified that there was no time he did not see what happened from his seat on the crane; that he "was in good vision"—and "had a good view"; that the sling came unhooked or broke "or whatever happened," and he could see the "cable and the chain coming through the hook"; that the chain and wire rope had not broken, but one end "had to" come loose for "the chain had slipped right through the hook."

Appellants contend that the evidence presents a proper case for the application of the doctrine of res ipsa loquitur. In the case of *Ybarra* v. *Spangard,* 25 Cal.2d 486, the court stated at page 489 [154 P.2d 687, 162 A.L.R. 1258]: "The doctrine of res ipsa loquitur has three conditions: '(1) the accident must be of a kind which ordinarily does not occur in the absence of someone's negligence; (2) it must be caused by an agency or instrumentality within the exclusive control of the defendant; (3) it must not have been due to any voluntary action or contribution on the part of the plaintiff.' (Prosser, Torts, p. 295.)" It appears, and it is conceded apparently by the parties, that the evidence is sufficient to meet the requirements of conditions (1) and (3). The substance of defendants' argument is that the evidence is insufficient to meet the requirements of condition (2) in that exclusive control by defendants over the instrumentality causing the accident was not shown.

"Where a judgment is rendered upon a motion for nonsuit, the court must assume that all evidence received in favor of the plaintiff relevant to the issues is true. All presumptions, inferences and doubtful questions must be construed most favorably to the plaintiff." (*Hinds* v. *Wheadon,* 19 Cal. 2d 458, 460 [121 P.2d 724].) As stated above, defendant Phillips testified that the crane, which included its equipment, was at all times under his exclusive control, and that he operated it with no supervision as to its operation from anyone. It was stated in the case of *Alexander* v. *Wong Yick,* 25 Cal. App.2d 265, at page 269 [77 P.2d 476]: "The reason for the application of the doctrine of *res ipsa loquitur,* and the very hypothesis of the doctrine, is that 'ordinarily the one injured is not in a position to know more than that, by some unusual movement of the instrumentality, he was injured, whereas the one who operates the instrumentality should know and be able to explain the precise cause of the accident.' (19 Cal.

Jur. pp. 706, 707.)'' Defendants assert that control was divided since employees of Acme made and attached the sling to the arrester, and then hooked the arrester to the ''U'' shaped hook hanging from the boom of the crane. ▓ The record discloses that Phillips not only had exclusive control of the crane and its hoisting equipment, but that he also had exclusive control of the arrester prior to and at the time of the accident. He alone, by means of clutches, levers and a brake, put the boom into motion, released the cable, lifted, lowered and swung the arrester to different positions. He was in exclusive control of the mechanical power used in moving the arrester. He was in complete control of the mechanism which regulated movements of the arrester—whether fast or slow, smooth or jerky. He was sitting on a seat facing the arrester and the boom, and he testified that there was no time he did not see what happened. He was in a better position than anyone else to ascertain and explain the cause of the accident. Furthermore, he operated the same crane ''all the time,'' was the only one who inspected it, and, it appears, he made no inspections of it except at such times as he was engaged in operating the same. There was no safety or secondary cable on the hook. There was further evidence that the sling was still attached to the hook after the arrester had fallen, and that when the arrester fell it did not tilt, but was level and fell into position.

The evidence is sufficient to create an inference of negligence on the part of defendants, and plaintiffs should not be deprived of the benefit of the doctrine merely because some agency over which defendants had no control could have caused the accident. In the case of *Lejeune* v. *General Petroleum Corp.*, 128 Cal.App. 404 [18 P.2d 429], an action brought under the Jones Act, plaintiff was a seaman who was injured when an anchor chain which he was stowing in a locker room of the ship suddenly ceased coming in, reversed its course, and threw him from the chain pile. The chain was being hoisted by means of a steam driven winch, and lowered into the locker room through a pipe. When the chain ceased coming in, certain safety devices, one of which was on the winch, failed to stop its reverse course. Defendant therein contended that the doctrine of res ipsa loquitur did not apply as the accident was due to the intervention of agencies over which it had no control, and that the direct cause of the reversal of the anchor chain was the fouling of the anchor in a rocky reef,

coupled with the heavy swell of the sea. It was held in that case that the doctrine is not limited to cases where the nature of the accident not only supports the inference of defendant's negligence but also excludes all others; and that where either of two inferences may be reasonably drawn from the facts it still remains a question of fact for the jury. The court stated, at page 416: "It has been held in several cases involving the doctrine in question that the inference of negligence may arise regardless of the fact that the injury might have been caused by some other agency; and that where the explanation leaves it doubtful as to whether or not the ultimate cause of the injury was the negligence of the defendant the question is one to be determined by the jury from all the evidence in the case. . . . While the doctrine does not shift the burden of proof, it still being incumbent upon the plaintiff to prove defendant's negligence by a preponderance of evidence [citing authority], the inference arising from the accident cannot be disregarded [citing authority]. . . ."

The application of the doctrine depends upon the circumstances of the individual case. In the case of *Ybarra* v. *Spangard,* 25 Cal.2d 486, *supra,* which was a malpractice case where an unconscious patient, while on the operating table for an appendectomy, sustained injuries to his shoulder, defendants contended that the doctrine of res ipsa loquitur could not apply because there were several defendants and several instrumentalities, and there was no showing as to what instrumentality caused the injury or as to the particular defendant in control of it at the time of the injury. The court held that each of the defendants who had any control over the plaintiff's body, or over the instrumentalities which might have caused the injury, may properly be called upon to meet the inference of negligence by giving an explanation of his conduct. As to the condition of exclusive control, the court stated, at page 493: "An examination of the recent cases, particularly in this state, discloses that the test of actual exclusive control of an instrumentality has not been strictly followed, but exceptions have been recognized where the purpose of the doctrine of res ipsa loquitur would otherwise be defeated. Thus, the test has become one of right of control rather than actual control. . . . Moreover, this court departed from the single instrumentality theory in the colliding vehicle cases, where two defendants were involved, each in control of a separate vehicle."

■ Defendants further assert that the doctrine of res ipsa loquitur does not apply "since every act of the parties was testified to." The complaint contained only general allegations of negligence, and there was no attempt to prove the cause of the accident. Furthermore, it has been held that the introduction of evidence as to how the accident happened, and the cause thereof, does not necessarily prevent the application of the doctrine. (*Leet* v. *Union Pac. R. R. Co.,* 25 Cal.2d 605, 620 [155 P.2d 42, 158 A.L.R. 1008].) However, in the instant case no evidence was introduced by plaintiffs tending to show or explain why the arrester fell, and the inference of negligence on the part of defendants was not dispelled by testimony concerning the events preceding and following the accident.

■ Although plaintiffs contended that the doctrine of res ipsa loquitur was applicable under the evidence then before the court, they offered certain expert testimony in addition thereto. As stated above, after eight witnesses had testified on behalf of plaintiffs, counsel for plaintiffs stated to the court that he had finished plaintiffs' case except for one expert witness who was unable to be present until the next day. That witness had 21 years' experience in operating cranes, and was then operating the same type of crane as that involved here. Plaintiffs offered to prove that the witness would testify, in answer to a hypothetical question based upon assumed facts within the limits of the evidence, that if the weight which was being lifted had slipped off the hook, the crane and crane cable would have swung back violently and would have shaken the entire frame and equipment, including the cab; and that the jerky motions indicated that the brake was defective, glazed or greasy, or that the operator was negligent in the application and release of foot pressure upon the brake. Defendants' objection to that offer, which was sustained by the court, was made upon the ground that it was incompetent, irrelevant, immaterial, speculative and conjectural, and that the offer concerning the proposed testimony of negligent foot pressure was assuming facts not in evidence. Even though the evidence that had been received warranted the application of the doctrine of res ipsa loquitur, the objection to the offered testimony should not have been sustained. An opinion of the witness that the operator was negligent would not have been admissible but expert testimony as to how the crane

would have reacted if the weight had become detached from the hook would have been most material. . As shown above, there was evidence, including testimony by defendant Phillips, that there was no rebound of the crane, cable or loading block after the arrester fell. Furthermore, there was testimony by Phillips (who, as above stated, testified he did not see what happened), that the "chain had slipped right through the hook," and one end of the sling "had to" come loose to cause the arrester to fall. Such expert testimony was material evidence to be considered by the jury in determining whether the fault was in the brake or the operation of it.

The judgment of nonsuit is reversed.

Shinn, Acting P. J., and Kincaid, J. pro tem., concurred.

A petition for a rehearing was denied July 22, 1947, and respondents' petition for a hearing by the Supreme Court was denied August 28, 1947.