[S. F. No. 19357. In Bank. Feb. 10, 1956.]

GIPSON E. SIMMONS, Appellant, v. RHODES AND JAMIESON, LTD. (a Corporation) et al., Respondents.

Russell F. King for Appellant.

Weinmann, Rode, Burnhill & Moffitt, L. R. Weinmann, John N. James, Hoey, Hall & Conti, James F. Hoey and Cyril Viadro for Respondents.

McCOMB, J.—Plaintiff purchased some ready-mixed cement from defendant Rhodes and Jamieson, Ltd., through its employee, defendant Harold Aydelotte. After using the mixture for the purpose for which it was intended, plaintiff suffered severe burns. He brought this action against the two defendants, setting forth causes of action for a breach of warranty and for negligence. The trial court granted a nonsuit at the close of plaintiff's case. Plaintiff appeals.

The facts most favorable to plaintiff are:

Plaintiff, a welder by trade, was constructing his own home. Shortly after laying the foundations, he met defendant Aydelotte, an employee of defendant Rhodes and Jamieson. Plaintiff showed Mr. Aydelotte around the premises and particularly the area where it was proposed to lay the concrete basement floor. The state of construction existing when Aydelotte inspected the premises made it apparent that such slab could only be laid by working inside the basement area. Aydelotte solicited the sale of cement for his company, and plaintiff agreed to buy, leaving the type of mixture up to the seller. At 10:30 a. m. on November 10, 1952, the defendant company delivered its first load of mixed cement. In order to reach the basement area, the cement was poured down a chute through a window opening and into the forms. Plaintiff added 10 gallons of water to it and requested that the succeeding loads be wetter. Three loads in all were delivered. Because plaintiff had difficulty in spreading the cement he secured the assistance of a neighbor. They leveled the cement by pushing it into position, using shovels and a long board for this purpose. During this maneuver plaintiff frequently got down on his hands and knees to shove the leveling board. At this time he was wearing galoshes, jeans, a khaki shirt and rubber gloves. Plaintiff testified that the galoshes were not worn to protect him from burns but to protect his feet from getting wet and to enable him to handle the slick shovel. He also testified that he had never seen anyone use rags or padding on his legs to protect them from the cement. He had observed that most cement workers worked while standing on boards, but believed they did this to keep from getting wet and dirty. No one had ever warned him of the danger of getting burned by cement, although he did know that exposure to wet cement caused a drying out of the skin. Prior to the accident he had had some experience with laying cement. On none of these occasions, although he had handled the cement with his bare hands, had he ever been injured by the use of the cement other than a roughening of the skin of his hands.

Plaintiff worked leveling the cement floor from 10:30 a. m. to 3:15 p. m. During half of this period his knees and legs were in contact with the wet cement. Shortly after 1 p. m. plaintiff began to notice a "tingle" on his legs, which became increasingly irritating. He continued to work, however, until the job was finished. Thereafter he washed his legs with soap

and water, observed that his legs "looked green," changed his clothes and got a neighbor to drive him to the hospital. There he was bathed again, medication applied to his legs, penicillin administered, and he was allowed to go home. Plaintiff returned to the hospital the next day for further treatment. Two days after the exposure to the cement plaintiff's temperature reached 103 degrees and he was hospitalized. It was then discovered that he was severely burned over 15 per cent of the area of his body, most of the burns being of the third degree type. As a result, two extensive skin grafting operations were performed and plaintiff was hospitalized for nearly two months. A doctor testified that plaintiff was not allergic to cement and "in my opinion this was definitely a chemical burn, due to contact with cement."

Notice of breach of warranty was reasonably and properly given.

On this evidence, on both causes of action, at the close of plaintiff's case, a nonsuit was granted.

These questions are presented:

### First

Assuming that there was an implied warranty of fitness for the purpose of laying a basement floor including a secondary warranty that the cement was reasonably safe to handle, did the evidence disclose a breach of warranty?

No.

Section 1735 of the Civil Code provides in part: ". . . there is no implied warranty or condition as to the quality or fitness for any particular purpose of goods supplied under a contract to sell or a sale, except as follows:

"(1) Where the buyer, expressly or by implication, makes known to the seller the particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill or judgment (whether he be the grower or manufacturer or not), there is an implied warranty that the goods shall be reasonably fit for such purpose.

"(2) Where the goods are bought by description from a seller who deals in goods of that description (whether he be the grower or manufacturer or not), there is an implied warranty that the goods shall be of merchantable quality."

Plaintiff claims a breach of implied warranty under the provisions of the foregoing section, his theory being that the cement was not of merchantable quality.

No evidence was introduced to show that this cement con-

tained any unusual substance or differed from ordinary cement in any way.

■ "Merchantable quality" means that the substance sold is reasonably suitable for the ordinary uses it was manufactured to meet. (27 Words and Phrases (perm.ed. 1940), 1955 Pocket Part, p. 26.)

■ It is conceded that the cement was fit for the purpose of laying a basement floor. This is the only purpose for which the test of merchantability could be applied under the facts of the present case. ■ There is likewise no merit in the proposition that the cement had a concealed or hidden danger unknown to plaintiff and that defendant should have warned him that it would burn the skin. The injury occurred in the handling of a standard and common commodity.

*Dushane* v. *Benedict,* 120 U.S. 630 [7 S.Ct. 696, 30 L.Ed. 810], relied upon by plaintiff is not applicable to the facts in this case. In the cited case defendant sold rags to the plaintiff for the purpose of manufacturing paper. The rags were infected with smallpox and, although they were made into satisfactory paper, several of plaintiff's employees died of smallpox in the process. There the court properly held there was a breach of warranty of fitness because rags are not normally infected with smallpox. In the present case, quicklime, which has a caustic effect, is one of the necessary ingredients of cement, and it is unquestioned that plaintiff was familiar with this fact.

SECOND

Was there a showing of negligence upon the part of defendants?

No.

■ The doctrine of res ipsa loquitur was not here applicable because in the absence, as in the present case, of evidence of feasible means of discovering the defects or danger in the commodity sold, the seller is not liable for an injury resulting from the use of the commodity. (*Honea* v. *City Dairy, Inc.,* 22 Cal.2d 614, 618 [3] et seq. [140 P.2d 369].)

The only evidence of any testing was that defendant Rhodes and Jamieson, Ltd., had its product tested for proper proportions of materials to be used for various types of construction.

■ In addition, the doctrine of res ipsa loquitur was not here applicable for the reason that when a plaintiff seeks recovery upon the theory that a commodity contains a foreign substance and admits that he added material to that delivered

by defendant, plaintiff must affirmatively show that the substance he added did not cause the injury. (*Zentz* v. *Coca Cola Bottling Co.*, 39 Cal.2d 436, 444 [9] [247 P.2d 344].)

Plaintiff may properly rely upon the doctrine of res ipsa loquitur even though he has participated in the events leading to the accident if the evidence excludes his conduct as the responsible cause. (*Zentz* v. *Coca Cola Bottling Co.*, *supra.*)

In the case at bar, plaintiff did not offer any evidence to show that the water which he had added to the cement had no effect.

It is a matter of common knowledge that water activates the lime in cement. (See *Dalton* v. *Pioneer Sand & Gravel Co.*, 37 Wn.2d 946 [227 P.2d 173, 174 et seq.] ; also "lime," Webster's New Internat. Dict. (2d ed. 1950), p. 1433; 6 Ency. Britannica (1951 ed.), p. 207.) A street superintendent testified that lime does not give off heat until it becomes wet. Obviously, thinning the solution would allow it to soak through the plaintiff's clothes more quickly.

Therefore, it is clear that when plaintiff added water to the cement, additional heat was created and the thinning of the cement caused the quicklime to be more readily absorbed by his clothing, which in turn resulted in his being burned.

Our conclusion is fully in accord with two recent decisions of this court. In *LaPorte* v. *Houston*, 33 Cal.2d 167 at 170 [199 P.2d 665], Mr. Chief Justice Gibson, speaking for the court said: "It was at least equally probable that the accident was caused by some fault in the mechanism of the car for which defendants were not liable as that it resulted from any negligent act or omission of the mechanic. Accordingly, it cannot be said that it is more likely than not that the accident was caused by the negligence of defendants, and hence the case was not a proper one for the application of the doctrine of res ipsa loquitur." In *Burr* v. *Sherwin Williams Co.*, 42 Cal.2d 682 at 691 [268 P.2d 1041], the Chief Justice, speaking for a unanimous court, said: "The instructions given, however, were erroneous in that, while they purported to state all the conditions under which res ipsa loquitur would be applicable, they did not inform the jury that plaintiffs must show that the instrumentality which caused the damage was not mishandled *or its condition otherwise changed after control was relinquished by the person against whom the doctrine is to be applied.*" (Italics added.)

■ Since the doctrine of res ipsa loquitur is not applicable under the facts of the instant case and there is a total absence of any negligence upon the part of defendants, the nonsuit was properly granted upon the second alleged cause of action.

The judgment is affirmed.

Gibson, C. J., Shenk, J., Traynor, J., Schauer, J., and Spence, J., concurred.

CARTER, J.—I dissent.

I disagree with the majority on both the question of implied warranty and breach thereof and res ipsa loquitur. The majority opinion omits important facts and states, contrary to the record, that there is no evidence on crucial points.

As appears more fully from the opinion of Mr. Presiding Justice Peters, hereinafter set forth, in speaking for the District Court of Appeal in this case, that there is evidence that the implied warranty of merchantability was breached because there is evidence that the cement caused the severe burns suffered by plaintiff and that such burns are not to be expected from the use of properly mixed concrete. Plaintiff did not know of the danger and defendant, producer of the material, must be presumed to know the character of its product.

On the issue of res ipsa loquitur, and the inference of negligence arising therefrom, the same above mentioned evidence is present. It is not important that defendant's tests did not reveal the dangerous character of the concrete. The evidence shows that ordinarily concrete does not cause burns. It follows that as this concrete, over which defendant exercised control, did cause burns, there is an inference of defendant's negligence.

As above stated I adopt the opinion of Mr. Presiding Justice Peters as follows:

"Plaintiff, Gipson Simmons, purchased some ready-mixed cement from defendant Rhodes and Jamieson, Ltd., through its employee, defendant Harold Aydelotte. After using the mixture for the purpose for which it was intended plaintiff suffered severe burns. He brought this action against the two defendants, setting forth causes of action for a breach of warranty and for negligence. The trial court granted a nonsuit at the close of plaintiff's case. Plaintiff appeals.

"The facts most favorable to the plaintiff are as follows:

"Plaintiff, a welder by trade, during his spare time, was constructing his own home. Shortly after laying the foundations, he met defendant Aydelotte, an employee of defendant Rhodes and Jamieson. Plaintiff showed Aydelotte around the premises, and, in particular, showed him the area where it was proposed to lay the concrete basement floor, an area 13½'x52'x4". The state of construction existing when Aydelotte inspected the premises made it apparent that such slab could only be laid by working inside the basement area. Aydelotte solicited the sale of cement for his company, and plaintiff agreed to buy, leaving the type of mixture up to the seller. At 10:30 a. m. of November 10, 1952, the defendant company delivered its first load of mixed cement. In order to reach the basement area the cement was poured down a chute through a window opening and into the forms. Because the mixture was not wet enough, the plaintiff added 10 gallons of water to it and requested that the succeeding loads be wetter. Three loads in all were delivered. Because plaintiff had difficulty in spreading the cement he secured the assistance of a neighbor. They leveled the cement by pushing it into position, using shovels and a long board for this purpose. During this maneuver plaintiff frequently got down on his hands and knees to shove the leveling board. At this time he was wearing galoshes, jeans, a khaki shirt and rubber gloves. Plaintiff testified that the galoshes and gloves were not worn to protect him from burns, but to protect his feet from getting wet and to enable him to handle the slick shovel. Plaintiff also testified that he had never seen anyone use rags or padding on his legs to protect them from the cement. He had observed that most cement workers worked while standing on boards, but believed they did this to keep from getting wet and dirty. No one had ever warned him of the danger of getting burned by cement, although he did know that exposure to wet cement caused a drying out of the skin.

"Plaintiff, prior to the accident, had had some experience with cement. He had helped to build some cement water tanks, had helped two neighbors pour cement foundations and flooring, and had occasionally poured cement while working with construction crews. On none of these occasions, although he had handled the cement barehanded, had he ever been injured by the use of the cement other than a roughening of the skin of his hands.

"Plaintiff worked leveling the cement floor from 10:30 a. m. to 3:15 p. m. During half of this period his knees and legs were in contact with the wet cement. His neighbor assistant did not come in direct contact with the wet cement to the same extent as did plaintiff. Shortly after 1 p. m. plaintiff began to notice a 'tingle' on his legs which became increasingly irritating. He continued to work, however, because of the necessity of leveling the floor before the cement set. Upon finishing the job he washed his legs with soap and water, observed that his legs 'looked green,' changed his clothes and got a neighbor to drive him to the hospital. There he was bathed again, medication placed on his legs, penicillin administered, and his attending doctor, because there were no beds available in the hospital, allowed him to go home. Plaintiff returned to the hospital the next day for further treatment, and the doctor visited him at home. Two days after the exposure to the cement plaintiff's temperature reached 103 degrees and the doctor had him hospitalized. It was then discovered that plaintiff was severely burned over 15 per cent of the area of his body, most of the burns being of the third degree type. This means that for the most part the burn extended through the entire thickness of the skin, that is, through both the epidermis and corium and down to the subcutaneous fatty tissue. This required two extensive skin grafting operations, the first, with three doctors, requiring 8 hours, and the second 5½ hours. Plaintiff was hospitalized for nearly two months. The doctor testified that plaintiff was not allergic to cement, and that 'in my opinion this was definitely a chemical burn, due to contact with cement.' Although defendant claims that this answer was stricken, no order striking it was made. At any rate, the fact that the burns were caused by contact with the cement is at least a reasonable, if not inevitable, inference.

"The street superintendent of Richmond, after qualifying as an expert in concrete construction, testified that during his 25 years of experience he had seen men many times work for three or four hour periods in cement doing hand troweling without the protection of boards or padding, and during that entire time he had never seen a man burned to the extent of requiring medical care, having observed, at most, a few pimples or chapping caused by the exposure to the cement. The attending physician testified that prior to treating plaintiff he had observed but one prior burn caused by exposure to concrete, and that was a small burn. He also testified

that there was very little medical literature on the subject of cement burns, he having seen only one article on the subject. In that article no case was reported so severe as to require skin grafting.

"A dermatologist, who had examined and treated plaintiff, testified that he had never seen or heard or read of a concrete burn as extensive or deep as that suffered by plaintiff, and that the burn suffered by plaintiff was a chemical burn which, in his opinion, based on the history of the case, was due to the cement or some substance in it. The burn was not caused by an allergy towards cement. This had been determined by certain allergy tests of various kinds of cement, including one test made from the very slab here involved.

"Notice of breach of warranty was reasonably and properly given.

"On this evidence, on both causes of action, at the close of plaintiff's case, a nonsuit was granted.

"*Propriety of Nonsuit on Warranty Cause of Action*

"Section 1735 of the Civil Code provides:

" '. . . there is no implied warranty or condition as to the quality or fitness for any particular purpose of goods supplied under a contract to sell or a sale, except as follows:

" '(1) Where the buyer, expressly or by implication, makes known to the seller the particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill or judgment (whether he be the grower or manufacturer or not), there is an implied warranty that the goods shall be reasonably fit for such purpose.

" '(2) Where the goods are bought by description from the seller who deals in goods of that description (whether he be the grower or manufacturer or not), there is an implied warranty that the goods shall be of merchantable quality.'

"Clearly, it was proper to grant the nonsuit as to defendant Aydelotte as to this cause of action. Obviously, he was the agent of Rhodes and Jamieson, and was not himself the seller within the meaning of the section.

"As to defendant Rhodes and Jamieson it appears that for the purposes of a nonsuit, all the elements required by the quoted section can be found in the evidence or in reasonable inferences therefrom. There can be no reasonable doubt that plaintiff made known to the agent of the seller the particular purpose for which the goods were required. It is also a reasonable inference that plaintiff relied on the seller's skill and judgment to pick the proper type and mixture of cement

for the flooring. There is no dispute that the cement furnished made a good cement floor. If it be assumed that the warranty here involved includes a warranty that the cement was safe to handle, a point later discussed, then it seems clear that it is a reasonable inference from the evidence that plaintiff relied on the seller's skill and judgment as to the cement being safe to handle. Plaintiff, to the seller's knowledge, had no means of testing the cement, and could not be reasonably expected to do so. The evidence shows that the seller used the service of a testing laboratory. Thus, it can reasonably be inferred that plaintiff relied upon the seller's superior knowledge as to the safety in handling the cement.

"The only debatable question is whether the implied warranty of fitness for a particular purpose includes not only the primary warranty that the cement was fit for the purpose of a cement floor, but also a secondary warranty that the cement was reasonably safe to handle in constructing the floor. On this subject there is a difference of opinion. There is at least one out-of-state authority directly in support of the seller's contention that the implied warranty here involved does not include a warranty of reasonable safety in handling. The case is *Dalton* v. *Pioneer Sand & Gravel Co.*, 37 Wn.2d 946 [227 P.2d 173]. There, as here, ready-mixed cement was purchased to construct a cement floor and the purchaser, while laying the floor, received severe burns from coming into contact with the cement. There, as here, the purchaser relied upon a breach of the implied warranty. A motion for dismissal was granted at the close of plaintiff's case. This was affirmed. The opinion on the point in question is quite short, contains no analysis of the nature of the warranty, and cites no cases in support of its conclusions. The court first pointed out (p. 174) that: 'No evidence was introduced to show that this cement contained any unusual substance, or differed from ordinary cement in any way.'* The court then disposed of the point in the following cursory manner: ' "Merchantable quality" means that the substance sold is reasonably suitable for the ordinary uses it was manufactured to meet. 27 Words and Phrases, Perm. Ed., Pocket Part. No contention is made by the appellant that the cement was not satisfactory for the purpose of laying a basement floor. This is the only purpose for which the test of merchantability

---

*"In this respect the Washington case differs from our case. In our case there is evidence from which it can be inferred that exposure to cement normally does not cause severe burns to the user.

could be applied under the act. We find the act to be inapplicable to the situation here presented.'

"The other cases cited by respondent on this issue are not directly in point. They are primarily concerned with the question of whether, under the facts involved, there was a breach of warranty, and do not discuss the existence of the warranty with which we are here concerned.

"As opposed to the Washington case, there are several out-of-state cases that do extend the warranty of fitness to include, logically, a warranty of safety in the article's use. Thus, in *Dushane* v. *Benedict*, 120 U.S. 630 [7 S.Ct. 696, 30 L.Ed. 810], the seller sold the buyer rags to be used in the manufacture of paper. The rags were infected with smallpox. Workmen in the factory became infected. The finished product—the paper—was apparently not dangerous because the manufacturing process killed the germs. But nevertheless the court held that there was a breach of the warranty of fitness for a particular purpose. After setting forth the facts, the court stated (p. 646) : 'This was of itself [furnishing infected rags] sufficient evidence to be submitted to the jury of a warranty and a breach of it. A warranty, express or implied, that rags sold are fit to be manufactured into paper, is broken, not only if they will not make good paper, but equally if they cannot be made into paper at all, without killing or sickening those employed in the manufacture.'

"Plaintiff also cites a series of clothing and cosmetic cases that are not directly in point. In all of them clothing or cosmetics caused injury to the wearer or user. In all of them the court found a breach of the implied warranty. In such cases the purpose for which the clothing or cosmetics were sold was to wear or use them. Obviously, if they could not be worn or used safely they were not fit for the purpose for which they were sold. Thus, the cases are not directly in point. In one of them, however—the case of *Flynn* v. *Bedell Co.*, 242 Mass. 450 [136 N.E. 252, 27 A.L.R. 1504]—there appears the following pertinent language (p. 253) :

" 'It well may be that the scope of an implied warranty of fitness does not extend to fitness in respect of matters wholly unknown to the dealer and peculiar to the individual buyer. A seller of food presumably does not warrant that the particular kind of food which the buyer calls for will be suited to his peculiar idiosyncracies. . . . But it appears

that the particular "defect" which injured the plaintiff would have similarly injured any normal person. . . .

" 'The scope of the statutory implied warranty cannot be limited so as to exclude a warranty against the latent presence of foreign substances which are injurious in the course of the normal use of the garment for the purpose intended.'

"Although the exploding bottle case of *Escola* v. *Coca Cola Bottling Co.*, 24 Cal.2d 453 [150 P.2d 436], is not directly in point, in the concurring opinion of Mr. Justice Traynor, at page 464, there appears some language that is helpful. It is as follows: 'The retailer, even though not equipped to test a product, is under an absolute liability to his customer, for the implied warranties of fitness for proposed use and merchantable quality include a warranty of safety of the product.'

"On principle it would be unreasonable and unjust to hold that the warranty is limited to the safety of the end product and does not include a warranty that the goods furnished can be safely used in the construction of the end product. For that reason we are impressed with the reasoning of the United States Supreme Court in the Dushane case and are not impressed with the reasoning of the Washington court in the Dalton case. We, therefore, hold that for purposes of nonsuit there was an implied warranty that the cement was reasonably safe for the purpose of laying a concrete floor.

"The next question is whether there was any evidence of a breach of this warranty. In this connection, it must be kept in mind that as to this warranty the seller is not an insurer that the goods can be used with absolute safety or that they are perfectly adapted to the intended use. Section 1735 of the Civil Code merely requires that the goods be 'reasonably fit' for the intended use. (See also *Tremeroli* v. *Austin Trailer Equip. Co.*, 102 Cal.App.2d 464 [227 P.2d 923]; *Mix* v. *Ingersoll Candy Co.*, 6 Cal.2d 674 [59 P.2d 144].)

"On this question of breach, it is a matter of common knowledge, and was known to plaintiff, that cement contains lime. Plaintiff knew that lime is a caustic, and that exposure to it irritated the skin. Plaintiff also knew that cement workers customarily wore boots and worked from boards, although he testified that he thought that the purpose of this was to keep from getting dirty, not to keep from getting burned.

"On the other hand, there is direct evidence that these burns were of unusual severity, and it can be inferred that such burns do not normally occur upon exposure to wet cement. The street superintendent testified that he had seen men working unprotected in wet cement for long periods and never had seen anyone burned, although he had observed some chapping and some pimples. Both doctors testified that they had never seen, heard or read of a case of cement burn severe enough to require skin grafting. Plaintiff was not peculiarly allergic to cement. The evidence shows that it was reasonably necessary, in laying the floor, at least by an amateur, for plaintiff to expose himself to the cement, and that defendant knew the conditions under which the cement was to be used.

"For the purposes of a nonsuit, there can be no doubt that the evidence shows that the cement caused the burn. The two doctors so testified, and the hospital record indicated a cement burn. The irritation started two hours after exposure to the wet cement, and there is no evidence that plaintiff came into contact with any other substance that could have caused the burn.

"Thus, for the purposes of defeating a nonsuit, there was ample evidence of a breach of the warranty of fitness.

"It was, therefore, error to grant a nonsuit on the implied warranty cause of action.

"We now turn to the negligence cause of action. There is no evidence that defendant Aydelotte was negligent or had any control over the cement mixture. The nonsuit was proper as to him on this cause of action.

"As to defendant Rhodes and Jamieson, Ltd., whether the nonsuit was properly granted depends upon whether the doctrine of res ipsa loquitur is applicable to the facts. There has been a great deal written as to the scope of this doctrine in recent years, much of it by the California courts. It is not necessary to review those many cases in this opinion. It is now settled that the doctrine applies (1) if it can be reasonably concluded from a basis of experience, either common to the community, or brought out in the evidence, that the accident is of a kind that does not normally occur unless someone was negligent; (2) and, if it was caused by an instrumentality in the exclusive control of the defendant; (3) and, if it was not contributed to by a voluntary action on the part of the plaintiff. (See generally *Ybarra* v. *Spangard,* 25 Cal.2d 486 [154 P.2d 687, 162 A.L.R. 1258] ; *Escola*

v. *Coca Cola Bottling Co.*, 24 Cal.2d 453 [150 P.2d 436];
*Zentz* v. *Coca Cola Bottling Co.*, 39 Cal.2d 436 [247 P.2d 344];
Prosser on Torts, p. 295.)

"The first condition is here present. The two doctors, and
the street superintendent, testified that they had never seen,
heard of or read about cement burns of the severity of those
here involved. It was shown that plaintiff was not pecu-
liarly susceptible or allergic to cement. This is all that was
needed to comply with the first requirement. As was said
in *Stanford* v. *Richmond Chase Co.*, 43 Cal.2d 287, 292 [272
P.2d 764], this requirement is met 'where it appears that
the accident is of such a nature that it can be said, in the
light of past experience, that it probably was the result of
negligence by someone and that the defendant is probably
the person who is responsible.' (See also, in addition to the
authorities cited, *supra*, *LaPorte* v. *Houston*, 33 Cal.2d 167
[199 P.2d 665]; Prosser, *Res Ipsa Loquitur in California*,
37 Cal.L.Rev. p. 183, at p. 195.)

"It is equally clear that, for the purpose of getting by a
nonsuit, the third requirement—reasonableness of use by the
plaintiff—was here shown. The plaintiff, of course, assumed
the normal risks of the ordinary effects of exposure to wet
cement—roughening of the skin and a rash—but there is no
evidence or no inference from the evidence that as a reason-
able man he knew, or should have known, that there was a
risk of third degree burns. In fact, the inference is quite
to the contrary. The defendant knew that the cement had to
be spread from inside the basement, and knew, or should have
known, that exposure to the wet cement was reasonably
possible. The method used to spread the cement was reason-
able under the circumstances.

"On this appeal from a judgment of nonsuit we are, of
course, not concerned with contributory negligence. That is
an affirmative defense, and can only be involved if the evi-
dence shows, as a matter of law, that plaintiff was contribu-
tively negligent. No such showing was here made.

"The only debatable issue is whether the defendant had
'exclusive control' of the instrumentality causing the injury.
In this connection the courts have held that the fact the
accident occurred sometime after the defendant relinquished
control of the instrumentality causing the injury does not,
*per se*, preclude the application of the doctrine, nor does the
fact that the defendant may not be in a better position than
plaintiff to explain the accident preclude its application if

it appears more probable than not that the injury resulted from the acts of defendant. In *Zentz* v. *Coca Cola Bottling Co.*, 39 Cal.2d 436 [247 P.2d 344], these principles, supported by many authorities, were stated as follows (p. 443):

" 'The defendant, of course, should not be liable unless it appears from all the facts and circumstances that there is a sufficient causal connection between his conduct and the plaintiff's injury, and it has been held that res ipsa loquitur will not apply if it is equally probable that the negligence was that of someone other than the defendant. [Citing cases] . . . In dealing with this problem the courts have usually said that the defendant must have "management" or "control" of the agency or instrumentality which caused the injury. [Citing cases.] It has been stated that the purpose of this requirement is to eliminate the possibility that the accident was caused by someone other than the defendant. [Citing authorities.] Accordingly, its use is merely to aid the courts in determining whether, under the general rule, it is more probable than not that the injury was the result of the *defendant's* negligence.

" 'The requirement of control is not an absolute one. Although as we have seen, the doctrine will not ordinarily apply if it is equally probable that the negligence was that of someone other than the defendant, the plaintiff need not exclude all other persons who might possibly have been responsible where the defendant's negligence appears to be the more probable explanation of the accident. [Citing authorities.] Further, it is settled that the fact that the accident occurs some time after the defendant relinquishes control of the instrumentality which causes the accident does not preclude application of the doctrine provided there is evidence that the instrumentality had not been improperly handled by the plaintiff or some third persons, or its condition otherwise changed, after control was relinquished by the defendant. [Citing cases.] Of course, it must appear that the defendant had sufficient control or connection with the accident that it can be said that he was more probably than not the person responsible for plaintiff's injury.

" ' . . . As recently held by the Supreme Court of Oregon in a well reasoned opinion, a plaintiff may properly rely upon res ipsa loquitur even though he has participated in the events leading to the accident if the evidence excludes his conduct as the responsible cause. (*Gow* v. *Multnomah Hotel*, 191 Ore. 45 [224 P.2d 552, 555-560, 228 P.2d 791].)'

"The court also discussed what place the question of the defendant's superior knowledge of the cause of the accident has in the application of the doctrine, in the following language (p. 445):

" 'Another factor which some of the cases have considered in applying the doctrine is that the defendant may have superior knowledge of what occurred and that the chief evidence of the cause of the accident may be accessible to the defendant but inaccessible to the plaintiff. [Citing authorities.] It seems clear, however, that the doctrine may be applied even though the defendant is not in a better position than plaintiff to explain what occurred if it appears more probable than not that the injury resulted from negligence on the part of defendant. [Citing authorities.]'

"The court then went on to hold that there was a duty on the part of the bottling company to inspect and test the bottles for defects, and that the fact the bottles were furnished by another did not preclude application of the doctrine.

"The problem involved in the instant case is that the cement used by defendant in its mixture was furnished by the Ideal Cement Company. Ideal is not a party to this action. We have no way of knowing, nor has the plaintiff, whether the overly dangerous qualities of the mixture were the result of the defendant's actions, or whether it was caused solely by the cement furnished by Ideal. Either possibility is reasonable. But even if it be assumed that it is more reasonable that the burns were caused by the cement and not by anything the defendant added, this would not preclude the application of the doctrine as to defendant. When the defendant uses a material in a mixture that it sells, such defendant is under a duty to inspect reasonably that material to determine whether the material incorporated in its product is defective. This is certainly so where, as here, the defendant knows, or should know, that the plaintiff has no means of testing the product. Although the doctrine is not applicable where it is at least equally probable that the accident was caused by another (*LaPorte* v. *Houston*, 33 Cal.2d 167 [199 P.2d 665]), this rule is not applicable where the defendant is under a duty to inspect. This was the precise holding in the Escola and Zentz cases, cited *supra*. Although it appears that defendant used the services of a testing firm, the nature and scope of such service, or its reasonableness, do not appear in the evidence. The reasonableness of such inspection, if

any, is, of course, a matter of defense, and here the nonsuit was granted at the close of plaintiff's case.

"There was evidence that plaintiff added water to the cement after he received possession, but there was no evidence that this in any way was unreasonable or contributed to the injury. Whether plaintiff handled the product reasonably after receiving possession is a question of fact for the jury. (*Gordon* v. *Aztec Brewing Co.*, 33 Cal.2d 514 [203 P.2d 522].) The mere fact that water was added does not make the doctrine inapplicable as a matter of law. In the Zentz case the plaintiff put ice around the coke bottle. This was held not to preclude the application of the doctrine. The two situations are comparable.

"For the foregoing reasons we conclude that on the negligence cause of action the plaintiff, with the aid of the doctrine of res ipsa loquitur, made out a case sufficient to put the burden on defendant to show that it acted as a reasonable and prudent person would act under the circumstances.

"Thus, on both causes of action, it was error to grant the nonsuit.

"The judgment is affirmed as to defendant Aydelotte; it is reversed as to defendant Rhodes and Jamieson, Ltd. Plaintiff to recover costs from defendant Rhodes and Jamieson, Ltd."

Appellant's petition for a rehearing was denied March 8, 1956. Carter, J., was of the opinion that the petition should be granted.