[Civ. No. 21828.   Second Dist., Div. Three.   Mar. 18, 1957.]

ALFRED W. KELLER, Appellant, v. MORRISON-KNUD-
SEN COMPANY, INC. (a Corporation) et al., Re-
spondents.

Raoul D. Magana and Walter P. Christensen for Appellant.

Veatch & Thomas for Respondents.

VALLÉE, J.—Appeal by plaintiff from a judgment of nonsuit in an action for damages for personal injuries sustained when he was struck by a piece of pipe as it fell after it became loose from the hook of a cable while being lowered by a hoist owned and operated by defendants. The action was tried before a jury.

The rules which govern trial courts in the determination of a motion for a judgment of nonsuit and reviewing courts on appeal from such a judgment should be well known and need not be repeated.

The question is whether an inference of negligence was raised under the doctrine of res ipsa loquitur.

Plaintiff was an employee of Mehring and Hanson, the plumbing and heating subcontractors of defendants Morrison-Knudsen Company, Inc., and Ford J. Twaits Company, the general contractors in the construction of the police facilities building in Los Angeles. The accident occurred during a pipe raising maneuver from the ground to the fifth floor of the building where plaintiff and two coemployees were waiting to guide the pipe through a window, unload it, and stack it. The pipe was hooked by a choker to the end of a cable which was operated by a stationary hoist in a small shack

on the ground. The cable hung from the tip of a boom which was attached near the top of a tower of steel rigging constructed close to the building. The boom could be swung in a 270-degree arc; it could be swung over the roof of the building; its movement was controlled by a signalman on the roof pulling on a tagline. His job was to swing the boom toward the building when a load had reached its proper height.

In a loop at the end of the cable was a hook. The hook had a safety latch which extended across the opening of the hook; it could be pressed downward but when released snapped back toward the opening of the hook and closed it. Above the hook was a 200-pound cement ball, called a headache ball. Its purpose was to keep the cable taut as it hung from the boom. The tagline handled by the signalman on the roof was attached above the headache ball. It looped around the cable and slid free when the cable went up and down. Below the headache ball was another tagline which was fastened tight to the loop of the cable just above the hook. This tagline was handled by a signalman on the ground. The tagline men controlled the swaying of the load as it was raised and lowered. The hoist operator controlled only the general up-and-down movement. He could see only straight up through the roof of his shack, not to the sides where the taglines were. He relied on signals from the tagline men to raise and lower a load. The hoist operator and the two tagline men were employees of defendants.

The general procedure in preparing a length of pipe to raise it was to wrap a piece of cable with an eye on one end, called a choker, around the pipe together with softeners, small pieces of wood used to hold the pipe in the choker. This process is called rigging. The eye was slipped through the safety latch onto the hook, and the safety latch then snapped back against the hook. The slack was then taken out of the choker and the load was started up.

When a length of pipe reached a point above the fifth floor the tagline man on the roof of the building swung it close to the building. It was then lowered. When it reached a fifth floor window plaintiff and his two coemployees, standing on a wooden platform which jutted out of the window 18 to 24 inches, got hold of the tip of the pipe and guided it in through the window until it rested on the wooden platform which extended into the building 8 to 10 feet. When over half of the pipe was in the building it would be lowered onto

the platform. The choker would be disengaged from the pipe by LaVallie, one of plaintiff's coemployees, and the pipe would be pushed down a ramp from the platform into the building. The hook would not come into the building.

On the occasion in question, at the insistence of plaintiff as union steward, Willson, the foreman of Mehring and Hanson, did the rigging. Willson testified as to the steps he took in rigging the pipe: ''I would take the cable and thread it around the pipe, put the softeners around the cable, kick the cable down so it is good and tight, nod over to Mr. Taylor [the hoist operator] to lower the ball so I could snap the loop onto the hook. . . . Then I would kick the loop down to be sure it is good and tight, with the softeners around the wood. . . . Q. When the hook came down you put it in the hook? A. I would nod to Mr. Taylor when I had the thing ready. This headache ball was always up above, you know, up above my head so that I would not be bumping my head against it. As soon as I get the cable around the pipe, then I nod to Mr. Taylor. He lowers the headache ball and I hook and I just snap it in the safety catch and I step back. . . . Q. When you say that you would snap it onto the hook, what did you mean by that? A. The loop that I would hold in my hand after I had it secured around the pipe itself. Q. You would snap that over the safety catch right onto the hook? A. That is right, right onto the hook.'' He further testified: ''Q. At the time that the accident happened did you hook up the material the same way that you have done it on prior occasions? A. Yes, sir. Q. Did you look at the hook to make sure that you had the cable in the hook? A. Sure, you can hear it snap. There is a strong spring in that safety catch. Q. Was the cable, the inside of the safety catch like it is depicted in the photograph? [The photograph shows the choker properly fastened in the hook.] A. Yes, sir. Q. After you got that hooked up there what did you do? A. I stepped back and nodded to him and he started pulling her up. Q. By 'stepped back,' how far back did you step? A. Well, in order to get out of the way of the pipe in case it is setting at an angle I didn't want to get hit with it. After all, if the boom isn't straight it will swing the pipe over; so I stepped back beyond the end of the pipe, away from it. Q. When you put this choker around the pipe whereabouts on the pipe did you put it? A. About a third from either end. Q. Either end? A. That is right. Q. So that when it is raising in the air it is at an angle? A. Yes, sir, vertical. Q. Vertical?

A. Pretty near vertical.'' The hoist operator testified: ''Q. So that the pipe was attached by the use of the choker, the slip knot, the chunking, and put on to the hook in the same way that Mr. Johnson [the tagline man on the ground] would do it, isn't that right? A. Yes, sir. . . . Q. All right, now, No. 5. No. 5 approximately simulates the manner in which Mr. Willson did hook up the load, and the way he did it, he did it right, is that right? A. Yes, sir. Q. That is hooked up properly, is it not? A. Yes, sir.''

The pipe being raised was about 20 feet in length and weighed between 500 and 1,000 pounds. As it went up from the ground it dangled at an angle. It was raised from a point about 30 feet from the building and was brought over close to the building by defendants' employee pulling on the tagline from the roof. When the load had gone above the fifth floor, one of plaintiff's coemployees who was with him on the fifth floor signaled to the tagline man on the ground, who relayed it to the hoist operator. The hoist operator lowered the pipe. As the pipe came up it was about 10 feet from the window. It went by the window and out of sight of plaintiff and his coemployees in the building. It then reappeared and came back down where they could reach it. As the pipe was lowered the long end drifted into the window. Plaintiff, LaVallie, and his other coemployee then placed their hands on the tip of the pipe and started to guide it into the window. They did not lift it; they just balanced it. When it was about waist-high, coming into the building at about a 20-degree angle and the end about 4 or 5 feet inside the building and about two feet above the platform, the pipe suddenly jerked out of their hands, dropped, struck the platform, bounced to the ceiling, teetered, and fell out the window to the ground. As it did, it struck plaintiff, causing the injuries complained of. Pipe had bounced on the platform before but not that hard.

At the time the pipe fell the hook and choker were outside of the building. No one unsnapped the eye from the hook. No part of the pipe had touched the platform before it dropped. The end of the pipe was not bounced upon the platform by plaintiff or either of his coemployees before it dropped.

In some manner the choker had come out of the hook and safety catch. When the pipe came to rest on the ground the choker and the softeners were still around the pipe but in a different position. The loop of the choker was no longer

in the hook of the cable. The pipe with the entire choker had come down; the cable, headache ball, and hook were still above. There was no break or damage to the hook, the eye, or the loop of the choker, or to the safety catch. Defendants continued to work with the same hook and choker after the accident.

Defendants' motion for a judgment of nonsuit was granted. Plaintiff appeals. He contends the doctrine of res ipsa loquitur is applicable.

The doctrine of res ipsa loquitur has three conditions: 1. The accident must be of a kind which ordinarily does not occur in the absence of someone's negligence. 2. It must have been caused by an agency or instrumentality within the exclusive control of the defendant. 3. It must not have been due to any voluntary action or contribution on the part of the plaintiff. (*Ybarra* v. *Spangard,* 25 Cal.2d 486, 489 [154 P.2d 687, 162 A.L.R. 1258]; *Nungaray* v. *Pleasant Valley etc. Assn.,* 142 Cal.App.2d 653, 659 [300 P.2d 285].) The applicability of the doctrine depends on whether it can be said, in the light of common experience, that the accident was more probably than not the result of the defendant's negligence. (*Seneris* v. *Haas,* 45 Cal.2d 811, 824 [291 P.2d 915]; *Burr* v. *Sherwin Williams Co.,* 42 Cal.2d 682, 687 [268 P.2d 1041].) "The reason for the application of the doctrine of *res ipsa loquitur,* and the very hypothesis of the doctrine, is that 'ordinarily the one injured is not in a position to know more than that, by some unusual movement of the instrumentality, he was injured, whereas the one who operates the instrumentality should know and be able to explain the precise cause of the accident.' " (*Alexander* v. *Wong Yick,* 25 Cal.App.2d 265, 269 [77 P.2d 476].)

The evidence is sufficient to meet the requirements of conditions one and three. Defendants argue the evidence is insufficient to meet the requirements of condition two in that exclusive control by them of the instrumentality causing the accident was not shown. The requirement of control is not an absolute one. "In order that a plaintiff be entitled to the benefit of the doctrine of res ipsa loquitur, he need not exclude every other possibility that the injury was caused other than by defendant's negligence." (*Seneris* v. *Haas,* 45 Cal.2d 811, 826 [291 P.2d 915].) A plaintiff may rely on the doctrine even though he has participated in the events leading to the accident if the evidence excludes his conduct as the responsible cause. (*Simmons* v. *Rhodes &*

*Jamieson, Ltd.,* 46 Cal.2d 190, 195 [293 P.2d 26].)[1] ▮ The courts hold that all that is required is that the defendant exercise some control over the article involved in the accident, or exercise a right of control. ▮ Once it is shown that the defendant had some degree of control over such instrumentality, it is for the jury to say whether it is more probable that defendant's negligence caused the accident or not. (Prosser, *Res Ipsa Loquitur in California,* 37 Cal.L.Rev. 183, 199 et seq.) *Black* v. *Partridge,* 115 Cal.App.2d 639 [252 P.2d 760], was an action for wrongful death. The deceased was asphyxiated by carbon monoxide gas from a heater in a rented room. The court said (p. 646):

"It is appellant's theory that the evidence shows that decedent exercised some control over the adjustments on the heater and that he controlled the ventilation of the room. The heater was in his possession, and appellant points out that there is no evidence that he did not tamper with the

---

[1]In *Baker* v. *B. F. Goodrich Co.,* 115 Cal.App.2d 221 [252 P.2d 24], the court stated (p. 228): " 'As recently held by the Supreme Court of Oregon in a well reasoned opinion, a plaintiff may properly rely upon res ipsa loquitur even though he has participated in the events leading to the accident if the evidence excludes his conduct as the responsible cause. (*Gow* v. *Multnomah Hotel,* 191 Ore. 45 [224 P.2d 552, 555-560, 228 P.2d 791].)'

"The foregoing quotation would seem to dispose of respondent's contention that simply because the accident occurred while appellant was engaged in mounting the tire, in the accomplishment of which it was necessary to exert various forces thereon, the doctrine of res ipsa loquitur is necessarily rendered inapplicable. . . .

"[P. 229] How and to what extent plaintiff must account for his own conduct is explained by the same learned authority [Prosser] in his oft-cited article '*Res Ipsa Loquitur in California*', 37 Cal.L.Rev., 183, 201, as follows:

" '[T]he plaintiff's mere possession of a chattel which injures him does not prevent a res ipsa loquitur case where it is made clear that he has done nothing abnormal *and has used the thing only for the purpose for which it was intended.*

" 'The plaintiff need only tell enough of what he did and how the accident happened to permit the conclusion that the fault was not his. Again he has the burden of proof by a mere preponderance of the evidence, *and even though the question of his own contribution is left in doubt, res ipsa loquitur may still be applied under proper instructions to the jury.*' (Emphasis added.)

"Therefore, unless it can be said that the evidence here, as a matter of law, does not exclude 'his (appellant's) conduct as a responsible cause,' the fact that the accident occurred while he was engaged in the act of mounting and inflating the tire would not deprive him of the benefit of res ipsa loquitur. Where the evidence is conflicting or subject to different inferences, it is for the jury, under proper instructions, to determine whether each of the conditions necessary to bring into play the rule of res ipsa loquitur are present. (*Roberts* v. *Bank of America,* 97 Cal.App.2d 133, 137 [217 P.2d 129].)'' (See anno: 169 A.L.R. 958.)

adjustments prior to death, and that there is some evidence that he did so. Those are factors that have been declared to be important in some factual situations. [Citations.] But the more recent cases on this subject recognize the principle that the existence of the conditions upon which the operation of the doctrine is to be predicated is a question of fact, and carefully preserve the right of the jury to find those facts. [Citations.] These principles apply to the question of the degree of control that must be exercised before the doctrine is applicable.''

The Supreme Court in *Seneris* v. *Haas, supra,* 45 Cal.2d 811, said (p. 826):

''In *Baker* v. *B. F. Goodrich Co.,* 115 Cal.App.2d 221, 229 [252 P.2d 24], it was said: 'Where the evidence is conflicting or subject to different inferences, it is for the jury, under proper instructions, to determine whether each of the conditions necessary to bring into play the rule of res ipsa loquitur are present. (*Roberts* v. *Bank of America,* 97 Cal. App.2d 133, 137 [217 P.2d 129].)' [Citations.] The conclusion that negligence is the most likely explanation of the accident, or injury, is not for the trial court to draw, or to refuse to draw so long as plaintiff has . produced sufficient evidence to permit the jury to draw the inference of negligence even though the court itself would not draw that inference; the court must still leave the question to the jury where reasonable men may differ as to the balance of probabilities (Res Ipsa Loquitur in California, Prosser, 37 Cal.L.Rev. 183, 194-195). The inference of negligence is not required to be an exclusive or compelling one. It is enough that the court cannot say that reasonable men could not draw it. [Citation.] The existence of the conditions upon which the operation of the doctrine is to be predicated is a question of fact and the right of the jury to find those facts must be carefully preserved [citations].''

The facts in *Doke* v. *Pacific Crane & Rigging, Inc.,* 80 Cal. App.2d 601 [182 P.2d 284], were similar to those at bar. Acme had been engaged to install a spark arrester on an incinerator. The defendant operated a crane lift in lifting the arrester. Acme made a sling over the arrester to permit the lifting. A U-shaped hook, 6 to 8 inches in length, was used in the process. The decedent was an employee of Acme and had attached the hook to the sling several times to get the proper balance on the load. A coemployee of the decedent then attached a rope to the arrester to prevent it from turning

in the air. The decedent went to the top of the incinerator to signal the crane operator where to place the arrester. The load was lowered on a signal from the decedent. The decedent then signaled a halt in the lowering. Fifteen to twenty seconds after stopping, the load fell, killing the decedent. Immediately after the fall the sling was still in the hook. The defendants claimed control was divided since employees of Acme made and attached the sling to the arrester and then hooked the arrester to the hook hanging from the boom of the crane. This court held that res ipsa loquitur applied and stated (p. 607):

"The record discloses that Phillips . [the crane operator] not only had exclusive control of the crane and its hoisting equipment, but that he also had exclusive control of the arrester prior to and at the time of the accident. . . . [P]laintiffs should not be deprived of the benefit of the doctrine merely because some agency over which defendants had no control could have caused the accident." (See *Nungaray* v. *Pleasant Valley etc. Assn.*, 142 Cal.App.2d 653, 660 [300 P.2d 285].)

A permissible view of the evidence meets the second element of the doctrine. It cannot be said as a matter of law that the evidence does not exclude plaintiff's conduct and that of his coemployees as the responsible cause of the accident. It sufficiently appears that neither plaintiff nor either of his coemployees did anything abnormal. The evidence is uncontradicted that Willson properly rigged the choker to the pipe and properly fastened the choker to the safety hook. It is without conflict that the hook was not at any time within reach of plaintiff or his coemployees on the fifth floor and that neither plaintiff nor either of his coemployees bounced the end of the pipe on the platform before it dropped. From the time the pipe was rigged and the choker fastened to the hook, defendants' employees were in complete control of the mechanism which regulated the movement of the pipe, whether slow or fast, smooth or jerky; the hoisting apparatus, the boom, the cable, the raising and lowering of the pipe, the swinging of the cable were at all times under the exclusive control of defendants' employees. They were in complete control of the mechanism and the mechanics of lifting and lowering the pipe and bringing it to the fifth floor window. The jury could have inferred that the hoist operator jerked the hoist, or that there was a defect in the hoisting apparatus, or that the signalman on the roof in pulling the tagline

caused slack in the cable, or that the pipe was lowered too rapidly and then stopped suddenly. The balance of probabilities suggests negligence on the part of defendants' employees, who were responsible for the raising and lowering of the pipe, rather than that the accident was unavoidable or due to negligence of plaintiff or his coemployees. We think the evidence is such that it can be said the accident was more probably than not the result of the negligence of defendants.

We conclude that under the evidence the jury could find, aided by the inference permitted by res ipsa loquitur instructions, that the reasonable probability was defendants were negligent in operating the hoist or the cable or both, and that such negligence was a proximate cause of the accident. (*Seneris* v. *Haas*, 45 Cal.2d 811, 827 [291 P.2d 915] ; *Black* v. *Partridge*, 115 Cal.App.2d 639, 646 [252 P.2d 760].)

Reversed.

Wood (Parker), J., concurred.

SHINN, P. J.—I concur in the judgment. In order for the eye of the choker to slip out of the hook it would be necessary for the safety catch to be held down against the tension of a spring and while this was taking place for the choker to slide up and off the hook. I do not see how anyone could have anticipated this freakish action of inanimate objects. While it seems to me that the accident was unavoidable in a legal sense and not the proximate result of any action of defendants, I think the evidence presented a question for the jury.